## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| | : | |
| **FOURTH QUARTER PROPERTIES 86, LLC,** | : | **Case No.  15-10135-whd** |
| | : | |
|    **Debtor.** | : | |
| ―――――――――――――――――― | : | |
| | : | |
| **FOURTH QUARTER PROPERTIES 86, LLC,** | : | |
| | : | |
|    **Plaintiff,** | : | |
| | : | **Adversary Proceeding** |
|    **v.** | : | |
| | : | **No.** _____ |
| **MLIC ASSET HOLDINGS, LLC AND** | : | |
| **MLIC CB HOLDINGS, LLC** | : | |
| | : | |
|    **Defendants.** | : | |
| ―――――――――――――――――― | : | |

### COMPLAINT SEEKING PRELIMINARY AND LIMITED INJUNCTION, MOTION FOR PERMISSION TO FILE MOTION TO MODIFY PLAN, AND MOTION FOR RELIEF UNDER FRBP 9024

COMES NOW Fourth Quarter Properties 86, LLC ("**FQP 86**" or "**Debtor**"), Plaintiff in the above-styled action, and states its Complaint against Defendants MLIC Asset Holdings, LLC and MLIC CB Holdings, LLC (collectively, "**MetLife**") respectfully showing as follows:

### Parties, Jurisdiction and Venue

1.     This is an adversary proceeding commenced pursuant to Rule 7001(7) of the Federal Rules of Bankruptcy Procedure.  This adversary arises in and related to the case of *In re Fourth Quarter Properties 86, LLC*, 15-10135-whd (the "**Case**") pending in the United States Bankruptcy Court for the Northern District of Georgia, Newnan Division (the "**Court**").

2.     MLIC Asset Holdings, LLC is a limited liability company organized and operating under the laws of the State of Delaware and may be served through its Registered

Agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street,

Wilmington, New Castle County, Delaware 19801.  It may also be served through its counsel of

record in the Case, Gary A. Barnes, Esq., Baker, Donelson, Bearman, Caldwell & Berkowitz,

P.C., Monarch Plaza, Suite 1600, 3414 Peachtree Road, N.E., Atlanta, Fulton County, Georgia

30326.  MLIC Asset Holdings, LLC is the owner of an 86.666667% interest in a secured

promissory note executed by the Debtor.

       3.      MLIC CB Holdings, LLC is a limited liability company organized and operating

under the laws of the State of Delaware and may be served through its Registered Agent: The

Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New

Castle County, Delaware 19801.  It may also be served through its counsel of record in the Case,

Gary A. Barnes, Esq., Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., Monarch Plaza,

Suite 1600, 3414 Peachtree Road, N.E., Atlanta, Fulton County, Georgia 30326.  MLIC CB

Holdings, LLC is the owner of a 13.333333% interest in a secured promissory note executed by

the Debtor.

       4.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §

1334(a) and (b) and this Court may enter a final order in this core matter pursuant to 28 U.S.C. §

157(b). A bankruptcy court retains post-confirmation jurisdiction over matters with a "close

nexus" to a confirmed bankruptcy plan of reorganization that affect the interpretation,

implementation, consummation, execution, or administration of that plan. *In re Friedman's, Inc.*,

No. 05-40129, 2006 WL 6902023, at *2 (Bankr. S.D. Ga. Mar. 28, 2006). Because this adversary

proceeding requires this Court to interpret its own orders, the Plan of Reorganization, and rule on

Debtor's request to modify the Plan, there is a "close nexus" to the Plan, and, thus, jurisdiction.

       5.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

**Factual Allegations**

6.        On January 22, 2015, Debtor filed a voluntary petition in this Court for

reorganization under Chapter 11 of the United States Bankruptcy Code (the "**Petition Date**").

No trustee has been appointed.

7.        No Official Committee of Unsecured Creditors has been appointed or organized.

8.        Debtor, although headquartered in Newnan, Georgia, operates a working cattle

ranch known as the Little Jennie Ranch situated on over 3,000 acres of real property in Sublette

County, Wyoming (the "Ranch").

9.        As of the Petition Date, Debtor valued its assets at $49,124,607.73, primarily

comprised of the above-described real property located in Sublette County, Wyoming valued at

$46,029.895.50 and $3,094,712.23 in personal property primarily consisting of cattle and

accounts receivable.  [Doc. No. 30].

10.        As of the Petition Date, Debtor had total estimated liabilities of $75,377,945.46,

consisting of a disputed secured obligation to MetLife of approximately $23,203,543.17, which

was subsequently settled by consent order for $26,817,815.96, entered by this Court on

December 2, 2015.  [Doc. No. 136].  The Ranch also secured collateral for a second secured

obligation in favor of John D. Phillips in the amount of $28,051,076.56.  [Doc. No. 30].  Debtor

also scheduled various unsecured liabilities totaling $19,166,185.61 consisting of $24,133.63 in

trade payables and $19,142,051.98 in loans from affiliates.  [Doc. No. 30].

11.        Prior to the Petition Date, Debtor executed and delivered a First Mortgage Note to

Metropolitan Life Insurance Company in the principal amount of $30,000,000.00 (the "**Note**").

The Note was secured by virtue of a Security Agreement in the above-described real property as

well as Debtor's interest in USDA Forest Service Grazing Permits Nos. 232 and 4105 (the

"**Collateral**").  The First Mortgage and Security Agreement are recorded in the Office of the

County Clerk of Sublette County, Wyoming in Book 143, Page 54.

12.    Subsequent to execution of the First Mortgage and Security Agreement,

Metropolitan Life Insurance Company assigned to MLIC Asset Holdings, LLC an 86.666667%

interest in the First Mortgage and Security Agreement and the remaining 13.333333% interest to

MLIC CB Holdings, LLC.

13.    John D. Phillips ("**Phillips**") holds a junior mortgage on the Ranch to secure a

debt in the amount of $28,051,076.56 as of the Petition Date.

14.    On August 28, 2015, Debtor filed its *Disclosure Statement and Liquidating Plan
of Reorganization* (the "**Original Plan**"). [Doc. Nos. 105 and 106].

15.    On October 16, 2015, MetLife filed its *Motion for Relief from the Automatic Stay
Pursuant to 11 U.S.C. § 362(d)(1) and (d)(2), Request for Adequate Protection or, in the
Alternative, Motion to Convert Case to Chapter 7* (the "**Motion for Relief**").  [Doc. No. 117].

16.    On December 23, 2015, Debtor filed its *Amended Disclosure Statement and
Amended Liquidating Plan of Reorganization* (the "**Plan**").  [Doc. Nos. 140 and 141].

17.    On March 15, 2016, the Plan was confirmed by this Court pursuant to 11 U.S.C. §
1129 (the "**Confirmation Order**").  [Doc. No. 168].  A true and correct copy of the
Confirmation Order is attached hereto as **Exhibit 1**.

### The Consent Order Denying Relief from Stay

18.    On December 2, 2015, the Court entered a *Consent Order* on the Motion for

Relief denying with terms relief from stay (the "**Consent Order**").  [Doc. No. 136].  A true and

correct copy of the Consent Order is attached hereto as **Exhibit 2**.  The Consent Order was

sealed.  The Consent Order provides the following relevant terms:

        a.      MetLife and Debtor stipulated that MetLife's secured claim be allowed in the amount of $26,817,815.96 as of the Petition Date.

        b.      For continuing use of the Collateral, Debtor agreed to pay MetLife adequate protection payments in the amount of $135,000.00 per month, beginning November 30, 2015 (for the month of November), and continuing on the 30th day of each month thereafter until October 31, 2016 (the "**Adequate Protection Payments**").

        c.      The Adequate Protection Payments were to be applied to interest accruing from the Petition Date through the sale of the Collateral at the non-default rate of five percent (5%) per annum.

        d.      Unless and until a default occurred, Debtor was to have through and including October 31, 2016 within which to market and sell the Collateral.  The Consent Order further provided that, if the Ranch was not sold, the automatic stay of 11 U.S.C. § 362 would terminate automatically on October 31, 2016, unless otherwise agreed to by MetLife, without further order of the Court or Notice to the Court and MetLife is permitted to pursue its rights and remedies under the underlying loan documents and state law of Wyoming with respect to the Collateral.

19.      With the exception of closing a sale of the Ranch by October 31, 2016, Debtor has complied with the terms of the Consent Order, including making all Adequate Protection Payments.

20.      By the terms of the Consent Order, the automatic stay expired on October 31, 2016.

**The Plan**

21.      Under the terms of the Consent Order, Debtor filed its Amended Plan on

December 23, 2015.  The Amended Plan, as modified by the Confirmation Order, incorporated

the terms of the Consent Order and provided for the marketing and sale of the Ranch by the

Reorganized Debtor, with the proceeds of sale being applied first to the satisfaction of the

allowed secured claim of MLIC Asset Holdings, LLC and MLIC CB Holdings, LLC, in the

combined aggregate of $26,817,815.96, with any net proceeds in excess of that payoff to be

applied to junior liens and allowed unsecured claims.  The Plan provided, further: "In the event

the proposed sale of the Real Property does not close on or before October 31, 2016, the Real

Property shall continue to be governed by the terms of that certain Consent Order dated

December 2, 2015 [Dkt. No. 136] between the Debtor and MetLife."

22.      In sum, the Plan provided Debtor with a 'drop dead' date of selling the real

property on or before October 31, 2016 or the real property would be governed by the Consent

Order.

**The Marketing of the Property**

23.      On August 13, 2015, Debtor filed an *Application for an Order Authorizing the

Employment and Retention of Jackson Hole Real Estate Associates, LLC as Real Estate Broker

for Debtor*.  [Doc. No. 100].  On August 14, 2015, the Bankruptcy Court authorized such

employment.  [Doc. No. 101].  Throughout the course of the Plan, Debtor continued to market

the real property.  The Broker engaged by Debtor was well educated on and affiliated with the

potential purchasers of the real property and held an affiliation with Christie's International Real

Estate, an affiliate of Christie's Auction House.

24.     Significant marketing efforts were made to sell the property including publication and advertisement in *The Wall Street Journal, The New York Times, Financial Times,* and *The Land Report*.  The advertisements were coupled with marketing exposure via videos, Christie's website, auction displays and promotional material in New York, London, and Hong Kong. Additionally, the real property was featured in various e-newsletters sent to approximately 50,000 Christie's clients.  A true and correct copy of the marketing report is attached hereto as **Exhibit 3.**

25.     The marketing efforts generated significant interest in the Ranch.

26.     Due to the seasonal real estate market in Wyoming, the prime period for property sales is the summer.

27.     In the summer of 2016, the area surrounding the ranch was engulfed by forest fire, severely inhibiting site visits to the property.

28.     According to news sources, a lightning-sparked fire was discovered around 2:30 p.m. on Sunday, July 17, 2016 next to Highway 191 at Cliff Creek (the "**Fire**").  As of August 1, 2016, the Fire had burned approximately 29,000 acres of land in close proximity to the Ranch. According to the local newspaper, to contain the fire, the firefighters set up a preventative burn "past the east end of Little Jennie Ranch hayfields between Shoal and Dell creeks." Furthermore, the Ranch was used as the staging area for firefighters battling the blaze.

29.     In the end, the Fire engulfed more than 34,313 acres and resulted in the closure of Highway 191, the main artery between the ranch and Jackson, Wyoming, and evacuations in the vicinity. The Ranch was ordered evacuated from July through September 2016, during which time the property could not be shown to potential purchasers.

30.     The Fire was eventually contained in August, but nonetheless severely impaired the marketability of the property during the prime summer sales period and resulted in the death of a number of the Debtor's cattle.  True and correct copies of information regarding the Fire are attached hereto as **Exhibit 4**.

31.     With the monumental and unexpected fire, Debtor was unable to obtain an offer for the sale of the Ranch and close on the transaction within the period contemplated by the Consent Order, it being very difficult to sell real property which is on fire, or immediately threatened by fire.

### The Contract

32.     On October 31, 2016, Debtor received an offer to purchase the real and personal property for the sum of $35,000,000.00 (the "**Offer**").  A true and correct copy of the Offer is attached hereto as **Exhibit 5**.  The purchaser of the property is KJ Overseas Investment Limited, a Chinese private limited liability company (the "**Purchaser**") who Debtor understands is represented by William J. Ching, Esq. of Nelson Mullins in Atlanta.

33.     The closing of the Offer is scheduled to occur on or before December 31, 2016.

34.     On October 31, 2016, counsel for Debtor conveyed the Offer to counsel for MetLife via telephone call and email.  A true and correct copy of the October 31, 2016 email correspondence is attached hereto as **Exhibit 6**.

35.     Debtor, in a good faith attempt to follow the terms of the Plan and Consent Order, requested a sixty (60) day extension until December 31, 2016 to sell the Ranch and offered to continue to make Adequate Protection Payments during the extension.

36.     MetLife rejected the Debtor's proposal.

37.    Furthermore, MetLife's reason for rejecting the proposal and Offer is that it did not know the Purchaser.  On November 9, 2016, MetLife's counsel indicated after rejection MetLife has not performed any due diligence on the Purchaser and would not do so.

38.    The sale to the Purchaser would generate proceeds sufficient to pay MetLife in full.

39.    The sale to the Purchaser would generate proceeds sufficient to pay Mr. Phillips in part.

40.    The sale to the Purchaser would generate proceeds to pay unsecured creditors in part.

## Count I

### (Motion for Preliminary and Limited Injunction against MetLife)

41.    Debtor incorporates herein the allegations set forth in the above paragraphs 1-40 in their entirety as if set forth in full herein.

42.    To obtain preliminary injunctive relief, Plaintiff must establish that (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest. *SRB Inv. Servs., LLLP v. Branch Banking & Trust Co.*, 289 Ga. 1, 5, 709 S.E.2d 267, 271 (2011).

43.    Although one seeking interlocutory injunctive relief need not always "prove all four of these factors," a trial court must keep in mind that "an interlocutory injunction is an extraordinary remedy, and the power to grant it must be prudently and cautiously exercised." *Jansen-Nichols v. Colonial Pipeline Co.*, 295 Ga. 786, 787 (2014).

*Substantial Likelihood of Success on the Merits*

44.    Debtor has a substantial likelihood of prevailing on the merits.  It seeks permission from this Court to modify the Plan pursuant to 11 U.S.C. § 1127(b) to extent the period to sell the Property to December 31, 2016 as provided in the Offer.

45.    11 U.S.C. § 1127(b) provides:

**(b)** The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

46.    Thus, for this Court to approve a modification of the Plan post-confirmation, it must find (1) the modification is proposed by the reorganized debtor, (2) substantial consummation of the plan has not occurred, (3) the plan as modified meets the requirements of §§ 1122 and 1123, (4) the circumstances warrant such modification, and (5) notice has been given and a hearing held.

47.    "Substantial consummation" as defined in 11 U.S.C. §1101(2), has not yet occurred.  Specifically, the property proposed by the Plan to be transferred has not been transferred as the Ranch, which was proposed by the Plan to be sold, has not yet been sold, due substantially to an intervening Act of God.  Furthermore, no distributions under the Plan have been made. Substantial consummation requires all three elements.

48.    The Plan as modified meets the requirements of §§ 1122 and 1123.  The Court previously found that the Plan meet the requirements of §§ 1122 and 1223 and the modifications contain nothing that would disturb this finding.

49.    Courts have granted modification of plans where the failure was not the fault of the debtor, but was a result of some unexpected third-party's failure or an unanticipated event.

50.    The case having the greatest factual similarity to the case at bar is *In re Temple Zion*, 125 B.R. 910, 913 (Bankr. E.D. Pa. 1991).  In *Temple Zion*, the court found circumstances warranted such modification because the sale of an unimproved portion of real property, "the centerpiece of the Plan", was not sold prior to the deadline contained in the plan due to the failure of the zoning board to approve the necessary zoning for debtor to sell to an identified buyer.  Furthermore, the debtor would continue to make adequate protection payments and the objecting secured lender held "a substantial equity cushion."  The court reviewed the requirements of § 1127(b) and found that the Debtor had satisfied each.  Thus, the court approved the requested modification over the vehement objection of the secured creditor.

51.    *In re Boylan Intern., Ltd.*, 452 B.R. 43 (Bankr. S.D.N.Y. 2011) also supports the Reorganized Debtor's request for modification.  In *Boylan*, the debtor's plan provided for a liquidation trust with "the Trust's most important asset" being a malpractice claim against the debtor's former counsel. *Id.* at 45.  The court found that "the delay in prosecuting the Malpractice Claim was unforeseeable because of protracted trial and appellate litigation" since after two and a half years, the proceeding has only passed the motion to dismiss stage. *Id.* at 49.  The court focused on the "opportunity to achieve value from the Trust's most important asset."

52.    *In re Dean Hardwoods, Inc.*, 431 B.R. 387 (Bankr. E.D.N.C. 2010) illustrates the distinction the courts draw in determining whether to permit a modification of a confirmed plan.

In *Dean*, the court reviewed a motion by the debtor to modify the plan as to two creditors. The court granted debtor's motion as to one, but not the other, creditor. The court found that the debtor had been unable, through no fault of its own, to obtain approval by the appropriate governmental entity of a new product, TimberSIL, for sale in North Carolina. This, the court found, was appropriate "unforeseen changed circumstances" sufficient to justify the modification. *Id.* at 393-94. However, as to a lessor of equipment to whom the debtor had failed to make adequate protection payments required by the plan, the court found that the proposed plan modification was not fair and equitable and denied the proposed modification as to the equipment lessor. *Id.* at 394. Injunctive relief being equitable, it is incumbent on the party seeking such relief to have performed equitably. *See, e.g.*, *Eastman Kodak Co. v. Fotomat Corp.*, 317 F. Supp. 304 (The phrase "he who seeks equity must do equity is a cardinal principal of extensive application in equity" and is "one of the oldest and best settled and most familiar maxims in equity" and "is applicable in every type of case."). In this case, FQP 86 is current on all adequate protection payments due under the Plan and proposes to extend such payments until the closing of the real property.

53.    In sum, there is substantial likelihood Debtor will be authorized to file its Motion to Modify Plan, in the form attached hereto as **Exhibit 7**. There is also substantial likelihood the Court will approve the proposed Motion to Modify once filed.

*Substantial Harm of Irreparable Harm if Injunction Is Not Granted*

54.    If the injunction is not granted there is substantial likelihood of irreparable harm to the second lien position creditor, Mr. John D. Phillips and other unsecured creditors in the case.

55.     As recited above, Phillips is a junior lienholder with a security interest in the subject property in the amount of $28,051,076.56 as of the Petition Date.

56.     If MetLife were to foreclose on the Collateral for the amount of its claim, Phillips would not receive any of the surplus which would otherwise be available under the sale of the Ranch to the Purchaser for $35,000,000.

57.     MetLife seeks to take advantage of the unsecured creditors and Phillips by not granting a short extension to December 31, 2016.  Such actions are without reason, in bad faith, and seeks a windfall in contravention of one of the fundamental principles in bankruptcy: to provide the creditors with as full of a recovery as the facts of the case will allow.

*Weighing of Competing Irreparable Harms*

58.     MetLife will not be harmed by the relief sought in the proposed Motion to Modify.  During the short extension, Debtor will continue to make Adequate Protection Payments preserving MetLife's position until the sale to occur on or before December 31, 2016.

59.     If the injunction is not granted, MetLife will receive a windfall to the detriment of all other creditors in the Case.

*The Public Interest*

60.     Finally, an injunction would not disserve the public interest.  The public interest here is to preserve the interests of creditors in the bankruptcy process and granting the injunction will accomplish the same.

**Count II**

**(Motion for Permission to File a Motion to Modify Plan Under 11 U.S.C. § 1127(b))**

61.     Debtor incorporates herein the allegations set forth in the above paragraphs 1-60 in their entirety as if set forth in full herein.

- 13 -

62.     Debtor's proposed Motion to Modify is attached hereto as **Exhibit 7**.

63.     The Motion to Modify seeks an extension until December 31, 2016 to close a sale of the property and does not otherwise materially change the treatment of any creditor.

64.     The Motion to Modify provides Debtor will continue to make Adequate Protection Payments to MetLife during the short extension, thereby preserving MetLife's position.

## Count III

### (Motion for Relief from the Consent Order Under Bankruptcy Rule 9024)

65.     Debtor incorporates herein the allegations set forth in the above paragraphs 1-64 in their entirety as if set forth in full herein.

66.     Bankruptcy Rule 9024(b) provides:

**On motion and just terms, the court may relieve a party of its legal representative from a final judgement, order, or proceeding for the following reasons**:
(1)     mistake, inadvertence, surprise, or excusable neglect;
(2)     newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move forward for a new trial under Rule 59(b);
(3)     fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4)     the judgment is void;
(5)     the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
(6)     **any other reason that justifies relief**.

Bankruptcy Rule 9024(b). [emphasis added].

67.     Bankruptcy courts, as courts of equity, have the authority to modify its own orders, including consent orders, under Rule 9024(b)(6), especially when new and unforeseen conditions arise and when vacating the order is necessary to do justice. *United States v. Swift*, 286 U.S. 106, 115 (1932) ("We reject the argument . . . that a decree entered upon consent is to

be treated as a contract and not as a judicial act. . . . The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be.").

68.     The only criteria under Rule 9024(b)(6) is to "accomplish justice." *In re Lebanon Steel Foundry* 48 B.R. 520, 524 (Bankr. M.D. Penn. 1985) ("In short, Rule [9024](b)(6) is a reservoir of equitable power to do justice in particular cases were relief is warranted.").

69.     Courts have reimposed the automatic stay when there are exceptional or unanticipated circumstances or in "instances of genuine injustice." *See In re Gledhill*, 76 F.3d 1070 (10th Cir. 1996) (collecting cases addressing stay relief under Rule 60(b)(6) and 9024(b)(6)).

70.     In *In re Johnson & Morgan Contractors*, 29 B.R. 372 (Bankr. M.D. Penn. 1983), debtor, a coal manufacturer, experienced an unexpected decreased demand for coal due to an unseasonably cool summer and unusually warm winter and a worldwide drop in demand for coal, which caused debtor's deliverables to drop from between 13,000 to 18,000 per month down to 6,000 per month. Due to this drop, debtor failed to abide by the terms of a consent order under which the secured creditor was granted relief from the automatic stay. The court granted a preliminary injunction against the secured creditor, reimposing the automatic stay.

71.     Likewise, in *In re Timmons*, 479 B.R. 597 (Bankr. N.D. Ala. 2012), the court found that the debtor had shown that the case was one of "genuine injustice." Thus, the Court found that relief should be awarded here to achieve substantial justice. *Id.* at 610.

72.     As provided above, the Consent Order provided a deadline of October 31, 2016 for the closing of a sale of the real property.

73.     As stated above, MetLife has unreasonably withheld its consent to extending the Consent Order through December 31, 2016 in exchange for a continuation of adequate protection payments. For this Court to allow MetLife to do so would be the opposition of "substantial justice" – rather it would be allowing MetLife to obtain a windfall at the expense of the other creditors. The Consent Order must be modified to provide a sale date of December 31, 2016, which will conform to the Debtor's modification of the Plan.

74.     As stated above, MetLife will not be harmed by such modification to the Consent Order or Plan, as the Debtor will continue to make Adequate Protection Payments persevering Metlife's position.

WHEREFORE, Debtor requests the Court:

(a)     Set a hearing on Debtor's request for a preliminary injunction through and including December 31, 2016;

(b)     preliminary and temporarily enjoin MetLife from attempting to exercise its state law rights to sell or otherwise dispose of the Debtor's real property before December 31, 2016;

(c)     grant the Debtor permission to file its proposed Motion to Modify Plan;

(d)     modify the Consent Order to provide a sale deadline of December 31, 2016; and

(e)     grant such other additional relief as this Court deems just and proper.

*[Remainder of this page intentionally left blank]*

Respectfully submitted this 18th day of November, 2016.

**STONE & BAXTER, LLP**
By:

*/s/ Ward Stone, Jr.*
Ward Stone, Jr.
Georgia Bar No. 684630
Matthew S. Cathey
Georgia Bar No. 759547
Thomas T. McClendon
Georgia Bar No. 431452
Counsel for Debtor

Fickling & Co. Building, Suite 800
577 Mulberry Street
Macon, Georgia 31201
(478) 750-9898
(478) 750-9899 *fax*
wstone@stoneandbaxter.com
mcathey@stoneandbaxter.com
tmcclendon@stoneandbaxter.com

G:\CLIENTS\FQP 86\Post Confirmation\Complaint for Injunction.11.17.16.docx

**Exhibit 1**

**Confirmation Order**



**IT IS ORDERED as set forth below:**


**Date:  March 15, 2016**

**W. Homer Drake**
**U.S. Bankruptcy Court Judge**

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | CASE NO. 15-10135-WHD |
| FOURTH QUARTER PROPERTIES 86, LLC, | : | |
| | : | CHAPTER 11 |
| Debtor. | : | |
| | : | |

**ORDER CONFIRMING AMENDED LIQUIDATING**
**PLAN OF REORGANIZATION DATED DECEMBER 23, 2015**

The *Amended Liquidating Plan of Reorganization of Fourth Quarter Properties 86, LLC dated December 23, 2015* [Dkt. No. 141] (the "**Plan**"), having come before this Court at a hearing for confirmation held on February 2, 2016; and

The Plan having been transmitted to all creditors, equity security holders and the United States Trustee in accordance with Federal Rule of Bankruptcy Procedure 3017; and

It appears the Plan provides for three (3) classes of secured claims; two (2) classes of unsecured claims; one (1) class of subordinated claims and one (1) class of equity interests. The Ballot Report filed in connection with the Plan [Dkt. No. 163] revealed the following:

| Class 1 – Impaired | Votes (#) | Accept (#) | Reject (#) | Accept ($) | Reject ($) | Result |
|---|---|---|---|---|---|---|
| Sublette County Treasurer | 1 | 1 | 0 | $8,216.68 | $0 | Accepted |
| **Class 2 – Impaired** | **Votes (#)** | **Accept (#)** | **Reject (#)** | **Accept ($)** | **Reject ($)** | **Result** |
| MLIC Asset Holdings, LLC and MLIC CB Holdings, LLC | 1 | 0 | 1 | $0 | $26,817,815.96 | Rejected |
| **Class 3 – Impaired** | **Votes (#)** | **Accept (#)** | **Reject (#)** | **Accept ($)** | **Reject ($)** | **Result** |
| John D. Phillips | 1 | 1 | 0 | $28,051,076.56 | $0 | Accepted |
| **Class 4 - Impaired** | **Votes (#)** | **Accept (#)** | **Reject (#)** | **Accept ($)** | **Reject ($)** | **Result** |
| Non-Tax Priority Claims | 0 | 0 | 0 | $0 | $0 | Not Voted |
| **Class 5 - Impaired** | **Votes (#)** | **Accept (#)** | **Reject (#)** | **Accept ($)** | **Reject ($)** | **Result** |
| Cushing, Morris, Armbruster & Montgomery, LLP | 1 | 1 | 0 | $2,797.35 | $0 | Accepted |
| **Class 6 - Impaired** | **Votes (#)** | **Accept (#)** | **Reject (#)** | **Accept ($)** | **Reject ($)** | **Result** |
| Fourth Quarter Properties 100, LLC | 1 | 1 | 0 | $14,158,035.88 | $0 | Accepted |
| Fourth Quarter Properties VII, LLC | 1 | 1 | 0 | $293,093.60 | $0 | Accepted |
| Fourth Quarter Properties XLI, LLC | 1 | 1 | 0 | $25,000.00 | $0 | Accepted |
| Fourth Quarter Properties XXXII, LLC | 1 | 1 | 0 | $4,665,922.50 | $0 | Accepted |
| **Class 7** | **Votes (#)** | **Accept (#)** | **Reject (#)** | **Accept ($)** | **Reject ($)** | **Result** |
| Equity Interest Holders of the Debtor | 0 | 0 | 0 | $0 | $0 | Not Voted |

The Debtor having announced the following clarifications and modifications to the Plan, in response to objections and requests made by creditors in Classes 2 and 3, which clarifications, along with additional statements made on the record, were agreed to in open court by such parties, :

1. Section 3.2.3 of the Plan is deleted and replaced with the following:

**3.2.3 Treatment of Claims in Class 2.** The Allowed Secured Claims of MLIC Asset Holdings, LLC and MLIC CB Holdings, LLC in the stipulated amount of $26,817,815.96 as of the Petition Date, plus interest at the non-default rate of 5% per annum accrued from the Petition Date to the Closing Date, plus post-petition reasonable attorney's fees and costs subject to review and approval by the Debtor, and less adequate protection payments made prior to the Closing Date, collateralized by a security interest in the Real Property is included in Class 2 and shall be paid in full on the Effective Date from the Net Proceeds from the sale of the Real Property. The Real Property collateralizing any Allowed Secured Claim in Class 2 shall be sold, under this Plan, free and clear of liens, claims, or interests pursuant to 11 U.S.C. § 1123(b)(4), with such liens claims or interest attaching to the proceeds of the sale, and the Debtor and any holder of any Allowed Secured Claim in Class 2 shall comply with 11 U.S.C. § 1142(b) with respect to the

transfer of the Real Property free and clear of liens, claims, and interests.  In the event the proposed sale of the Real Property does not close on or before October 31, 2016, the Real Property shall continue to be governed by the terms of that certain Consent Order dated December 2, 2015 [Dkt. No. 136] between the Debtor and MetLife.  If the Real Property does not sell for an amount in excess of the Allowed Amount of the Allowed Secured Claim in Class 2 as provided herein, the Net Proceeds of the Sale will be paid to the holder of the Class 2 Allowed Secured Claim, and the balance of the Allowed Claim in Class 2, including accrued but unpaid interest will be included in Class 5 and paid as provided for Allowed Claims in such Class. No provision of this Plan shall impair the credit bid rights of the holder of the Class 2 Claim or the right of the Debtor to contest the amount of any deficiency claim included in Class 5.  Except as provided in Section 4.2.9 of the Plan, and in this Order, the Plan shall not be deemed or construed to impair the rights, powers, or remedies available to the Class 2 claimant, whether under the Class 2 claimant's loan, transaction documents, or Pre-Petition Wyoming Judgment, at law, or in equity, against any non-debtor (including, without limitation, any co-maker of any note, any guarantor, or any other co-obligor of the Debtor) with respect to the indebtedness giving rise to the Allowed Class 2 Claim.

2.     Section 3.2.4 of the Plan is deleted and replaced with the following:

    **3.2.4     Treatment of Claims in Class 3.**  The Allowed Claim of John D. Phillips in the stipulated amount of $28,051,076.56 as of the Petition Date, collateralized by a second position security interest in the Real Property, is included in Class 3.  The Real Property collateralizing any Allowed Secured Claim in Class 3 shall be sold, under this Plan, free and clear of liens, claims, or interests pursuant to 11 U.S.C. § 1123(b)(4), with such liens claims or interest attaching to the proceeds of the sale, and the Debtor and any holder of any Allowed Secured Claim in Class 3 shall comply with 11 U.S.C. § 1142(b) with respect to the transfer of the Real Property free and clear of liens, claims, and interests.  Any Net Proceeds of such sale in excess of the amount payable to the holder of the Allowed Secured Claim in Class 2 hereunder, shall be paid to the holder of any Allowed Secured Claim in Class 3 on the Effective Date.  Claims in Class 3 are not designated to be paid in full under this Plan.  To the extent Net Proceeds from the sale of the Real Property are insufficient to pay the Class 3 claim in full, any deficiency will be treated as a Class 5 Claim.   In the event of Surrender, Class 3 shall only be entitled to distribution pursuant to Class 5.  No provision of this Plan shall be construed to impair or limit the credit bid rights or other rights of the holder of the Allowed Claim in Class 3 with respect to any other collateral for such claim pledged by non-debtors, or with respect to Guarantors or non-debtor obligors of such Allowed Claim.  Notwithstanding any provision of the Plan to the contrary, neither the Plan, nor the Class 3 claimant's acceptance of the Plan, shall be deemed or construed to impair the rights, powers, or remedies available to the Class 3 claimant, whether under the Class 3 claimant's loan or transaction documents, at law, or in equity, against any non-debtor (including, without limitation, any co-maker of any note, any guarantor, or any other co-obligor of the Debtor) with respect to the indebtedness giving rise to the Allowed Class 3 Claim, or any collateral for such claim pledged by non-debtors.

3

3.    Section 6.5.6.2 is deleted and replaced with the following:

**6.5.6.2    Objection Deadlines.**  Except as otherwise specified herein (including, without limitation, with respect to Administrative Claims, Fee Claims, and Executory Contract Claims), objections to Claims shall be Filed with the Bankruptcy Court and served upon Creditors by the Claims Objection Bar Date, which shall be no later than 60 days after the service of the Confirmation Order or 60 days after such Claim is Filed or amended, whichever date is later, provided, however, that this deadline may be extended by the Bankruptcy Court upon motion of the Debtor, without notice or a hearing.  After an order, judgment, decree or settlement agreement allowing a Disputed Claim becomes a Final Order, Distributions with respect to and on account of such previously Disputed Claim will be made on or before the time of the next scheduled distribution to holders of Allowed Claims in the Class in which the previously Disputed Claim is allowed.

4.    The definition of "**Claims Objection Bar Date**" in Paragraph 1.26 of Schedule 1

of the  Plan is hereby amended to read as follows:

1.26    "**Claims Objection Bar Date**" means with respect to Proofs of Claim filed on or before the Court's Bar Date, the later of 60 days after the Confirmation Date, or 60 days following the filing of any amendment to such Proofs of Claim; (b) with respect to Rejection Claims and other Proofs of Claim filed or amended after the Court's Bar Date, the later of 60 days following the Confirmation Date or 90 days following the Filing of, or the filing of an amendment to, such Proof of Claim.

5.    Section 8.4 is deleted and replaced with the following:

**8.4    Terms Binding/Novation**.    Upon the entry of the Confirmation Order, pursuant to 11 U.S.C. §1141(a), all provisions of this Plan, including all agreements, instruments and other documents filed in connection with this Plan and executed by the Debtor in connection with this Plan, shall be binding upon the Debtor, any entity acquiring property under the Plan, all Claim and Equity Interest Holders, the Guarantor, and all other Persons that are affected in any manner by this Plan, and this Plan shall novate and replace all Pre-petition agreements between the Debtor and such parties, expect as otherwise provided in this Plan, this Order or as provided  in that certain consent order dated December 2, 2015 [Dkt. No. 136] between the Debtor and MetLife.

6.    Section 4.2.4 of the Plan is amended to read as follows:

**4.2.4    Overview of Duties of the Debtor.**  The Debtor shall be empowered to and shall liquidate all real and personal property of the Estate and may engage brokers, auctioneers, and other professionals as may, in the judgment of the Debtor, be necessary for liquidating the Assets in an efficient and cost-effective manner.  The Debtor shall market the Real Property through a licensed broker and will attempt to

achieve a sale between the Confirmation Date and October 31, 2016 (the "Marketing Period"). The Debtor may market the Personal Property in tandem with the Real Property or separately. The Debtor shall provide all marketing updates received by the Reorganized Debtor to the holders of Allowed Secured Claims during the Marketing Period, and shall advise all holders of Allowed Secured Claims of any and all written offers for the real or personal property, within three (3) days of receipt by the Debtor during the Marketing Period. The Debtor shall not accept or reject any offer until at least seven (7) days after forwarding said offer to counsel for the holders of Allowed Secured Claims, unless the Class 2 holder of Allowed Secured Claim notifies Debtor that it has no opposition to Debtor's acceptance of the offer. The Debtor shall notify the holders of Allowed Secured Claims within twenty-four (24) hours of acceptance of any offer for the real property and provide sufficient information and details to enable the holders of Allowed Secured Claims to exercise their credit bid rights, if appropriate, as preserved under the Plan. All information provided by the Debtor to Parties in Interest pursuant to this Paragraph shall be kept confidential by the recipients thereof, and any filing with the Court during the Marketing Period arising out of or related to such information shall be filed under seal. If the Real Property and Personal Property are purchased by a common purchaser, the Debtor shall allocate the purchase price between the Real Property and Personal Property for purposes of the closing of the sale, any tax reporting in connection with the sale, and for purposes of determining distributions under this Plan. If the Personal Property does not sell in tandem with the Real Property or otherwise by October 31, 2016, the Debtor may arrange for the sale, for cash, of such Personal Property by private sale or public auction, employing such professionals as necessary to consummate such sale, and shall distribute the proceeds of such sale as provided under this Plan. The Debtor shall make all distributions required to be made under this Plan, and the Debtor shall be authorized and empowered to fully act as of the Confirmation Date, including without limitation, to (a) prosecute, settle or release all Causes of Action which the Debtor deems pursuit of to be prudent and cost effective, in accordance with the best interest of and for the benefit of the Creditors entitled to receive distributions under the Plan; (b) liquidate the Assets, including through any pending sale motions initiated by the Debtor, but not consummated as of the Confirmation Date or otherwise; (c) prosecute objections to Claims; (d) supervise the marketing and sale of the Property; (e) resolve Disputed Claims; (f) make distributions to the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, and holders of other Allowed Claims (as their respective interests may appear in accordance with this Plan) in as prompt, efficient and orderly fashion as possible in accordance with the Plan; (g) perform administrative services related to the implementation of this Plan; (h) employ attorneys and other Professionals, as further set forth below, to assist in fulfilling the Debtor's obligations under the Plan; and (i) otherwise act in accordance with this Plan and orders of the Bankruptcy Court.

The Court having determined that the modifications and clarifications set forth above do not adversely change the treatment of a claim of any creditor, and such modifications having

been consented to and accepted in open court by the effected classes, the Plan as modified hereby is deemed accepted as authorized by Federal Rule of Bankruptcy Procedure 3019(a); and

This Court having determined, solely in connection with the channeling injunction regarding the Guarantor provided under Paragraph 4.2.9 of the Plan:

(a)    The Debtor and the Guarantor share an identity of interest, such that a suit against the Guarantor or the Affiliates, such that a suit against the Guarantor or Affiliates is, in essence, a suit against the Debtor and would impair their ability to fund operating shortfalls, thereby jeopardizing consummation;

(b)    the Guarantor has committed to contribute such assets as may be necessary to ensure consummation of this Plan;

(c)    the Guarantor holds indemnity rights against the Debtor such that collection of an Allowed Claim through levy upon Guarantor's assets will not diminish claims which must be provided for under this Plan;

(d)    the Guarantor has accepted this Plan and committed to fund shortfalls as necessary until the Closing; and to the extent holders of Allowed Guarantor Claims have not accepted the Plan, the Plan is fair and equitable with respect to such Classes and does not unfairly discriminate against such Classes;

(e)    the Plan proposes to pay all Allowed Guarantor Claims in full, and is feasible;

(f)    the Plan preserves the post-judgment remedies of Holders of Allowed Guarantor Claims;

(g)    this Plan provision may be implemented under this Plan without the necessity of an adversary proceeding, and the Confirmation Order is sufficient to implement this provision under 11 U.S.C. § 1141; and

(h)    The channeling injunction provided under Paragraph 4.2.9 of the Plan is intended to and shall continue only during the Marketing Period, following which it shall be deemed lifted; and

The Court having determined that the requirements for confirmation set forth in 11 U.S.C. § 1129 have been satisfied with respect to the Plan, as modified hereby;

IT IS THEREFORE ORDERED THAT:

The Debtor's Plan, as modified herein, is CONFIRMED; and it is

FURTHER ORDERED that the terms and provisions of the confirmed Plan are incorporated herein and made a part of this Order; and it is

FURTHER ORDERED that in the event any provision of the Plan conflicts with the terms of the Order, the terms of this Order shall control; and it is

FURTHER ORDERED that this Order shall be effective as of the date and time of entry in accordance with Federal Rule of Bankruptcy Procedure 3020(e).

FURTHER ORDERED that within three (3) business days of the entry of this Order, Debtor's counsel shall serve a copy of this Order on (a) the Office of the United States Trustee; (b) parties who have requested notice or copies of such matters in this Bankruptcy Case; and (c) all other creditors and parties-in-interest in this Bankruptcy Case.

***END OF DOCUMENT***

**Order Prepared and Submitted By:**

/s/ Ward Stone, Jr.
Ward Stone, Jr.
Georgia Bar No. 684630
Matthew S. Cathey
Georgia Bar No. 759547
Stone & Baxter, LLP
Suite 800, Fickling & Co. Building
577 Mulberry Street
Macon, Georgia 31201
(478) 750-9898
(478) 750-9899 (fax)
Attorneys for Debtor

**Distribution List:**

R. Jeneane Treace, Esq.
Office of the United States Trustee
75 Spring Street, S.W., Room 362
Atlanta, Georgia 30303

Ward Stone, Jr., Esq.
Matthew S. Cathey, Esq.
Stone & Baxter, LLP
577 Mulberry St., Suite 800
Macon, Georgia 31201

Fourth Quarter Properties 86, LLC
45 Ansley Drive
Newnan, Georgia 30263

Gary A. Barnes, Esq.
Kathleen G. Furr, Esq.
Ron C. Bingham, II, Esq.
Baker, Donelson, Bearman,
Caldwell & Berkowitz, P.C.
1600 Monarch Plaza
3414 Peachtree Road, N.E.
Atlanta, Georgia 30326

David Whitridge, Esq.
Thompson, O'Brien, Kemp & Nasuti, P.C.
40 Technology Parkway South, Suite 300
Norcross, Georgia 30092

C. Edward Dobbs, Esq.
Parker, Hudson, Rainer & Dobbs LLP
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia 30303

Ryan K. McLemore, Esq.
Ryan McLemore Law
449 Chelsea Circle, NE
Atlanta, Georgia 30307

\\STONEANDBSERVER\vol1\CLIENTS\FQP 86\Plan\Confirmation Order\Confirmation Order.3.11.16.Final.doc

**Exhibit 2**

**Consent Order**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO. 15-10135 |
| | ) | |
| FOURTH QUARTER PROPERTIES 86, LLC, | ) | CHAPTER 11 |
| | ) | |
| _____Debtor._____ | ) | HON. W. HOMER DRAKE, JR. |
| | ) | |
| MLIC ASSET HOLDINGS, LLC and | ) | |
| MLIC CB HOLDINGS, LLC, | ) | |
| | ) | |
| Movants, | ) | |
| | ) | |
| v. | ) | CONTESTED MATTER |
| | ) | |
| FOURTH QUARTER PROPERTIES 86, LLC, | ) | |
| | ) | |
| _____Respondent._____ | ) | |

## CONSENT ORDER ON MOTION FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)(1) AND (d)(2), REQUEST FOR ADEQUATE PROTECTION OR, IN THE ALTERNATIVE, MOTION TO CONVERT CASE TO CHAPTER 7

On October 16, 2015, MLIC Asset Holdings, LLC and MLIC CB Holdings, LLC

(collectively, "MLIC") filed its MOTION FOR RELIEF FROM THE AUTOMATIC STAY

PURSUANT TO 11 U.S.C. § 362(d)(1) AND (d)(2), REQUEST FOR ADEQUATE

PROTECTION OR, IN THE ALTERNATIVE, MOTION TO CONVERT CASE TO CHAPTER 7 (the "Motion") [Dkt. No. 117]. An evidentiary hearing on the Motion was scheduled to come before this Court on November 17, 2015. In resolution of the Motion, MLIC and FOURTH QUARTER PROPERTIES 86, LLC (the "Debtor") hereby stipulate and agree as follows:

1.      The Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on January 22, 2015 (the "Petition Date").

2.      The Debtor has continued to operate its business and manage its property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3.      Prior to the Petition Date, the Debtor executed and delivered a First Mortgage Note and Loan Agreement in the principal amount of $30,000,000.00 (the "Note" and the "Loan Agreement") in favor of Metropolitan Life Insurance Company ("MetLife").

4.      The Note and the Loan Agreement are secured by a first priority security interest in certain real property commonly known as 3,011 Deeded Acres comprising Little Jennie Ranch located in Sublette County, Wyoming and as more particularly described in the First Mortgage and Security Agreement and Exhibit "A" thereto attached to the Motion (the "Collateral").

5.      The Note, the Loan Agreement, the First Mortgage and Security Agreement, and all related documents were subsequently assigned by MetLife to MLIC Asset Holdings, LLC (86.666667%) and MLIC CB Holdings, LLC (13.333333%).

6.      As of the Petition Date, for purposes of this case and the Debtor's Liquidating Plan of Reorganization, MLIC holds an Allowed Secured Claim in the amount of $26,817,815.96 (the "Allowed Secured Claim"), which Allowed Secured Claim for purposes

of this case and the Debtor's liquidating plan includes all obligations of the Debtor.

7.      As of the Petition Date, the obligations of the Debtor to MLIC were governed by the terms and conditions of the Note, the Loan Agreement, the First Mortgage and Security Agreement, the Order Granting Motion for Summary Judgment and Deed of Foreclosure entered on December 23, 2013 in the District Court of the Ninth Judicial District Within and For the County of Sublette, State of Wyoming, in Civil Action File No. 8099, and all related documents (collectively, the "Loan Documents").  MLIC holds an enforceable and duly perfected, first priority security interest in the Collateral.

8.      The Allowed Secured Claim is secured by the Collateral for all purposes in this case, including without limitation, the Debtor's Liquidating Plan of Reorganization.  The Allowed Secured Claim is absolutely and unconditionally owing, without defense, offset or counterclaim.

9.      The Debtor desires to retain possession of the Collateral after the Petition Date and, pursuant to the terms herein, continue to use it to operate its business.

10.     On account of such continued retention and use of the Collateral, MLIC is entitled to adequate protection to offset accrual of interest post-petition on the Allowed Secured Claim. The Debtor shall pay to MLIC adequate protection payments in the amount of $135,000.00 per month, beginning November 30, 2015 (for the month of November), and continuing on the 30th day of each month thereafter until October 31, 2016, unless further Order of this Court, the underlying debt is paid in full or the Collateral is sold by the Debtor pursuant to the terms herein prior to October 31, 2016 (the "Adequate Protection Payments").

11.     The Adequate Protection Payments shall be applied to interest from the Petition Date through the sale of the Collateral that will accrue on the Allowed Claim at the

non-default contract rate of five (5%) percent per annum..

12.    In addition to post-petition interest at the non-default contract rate, MLIC shall be entitled accrue its post-petition attorneys' fees and costs, pursuant to the Loan Documents, subject to review and approval of the Debtor as to the amount of such fees and costs, which shall be paid at the closing of any sale of the Collateral or as otherwise provided in this case by the liquidating plan of Debtor.

13.    For purposes of this case and Debtor's liquidating plan of reorganization, the security interest granted and conveyed by the Debtor to MLIC prior to the Petition Date shall continue in the Collateral until the Allowed Secured Claim is paid in full.

14.    The Debtor is authorized to execute and deliver all instruments, agreements, and other documents reasonably requested by MLIC to give effect to the terms hereof.

15.    All payments made by the Debtor to MLIC, pursuant to the terms herein, shall be delivered as follows:

**WIRE TO**:
JP Morgan Chase & Co., 270 Park Ave., New York, NY
To the Account of: MetLife Agricultural Investments
Account No.: 323-887260
ABA Routing No.: 021000021
Reference: INV-AI / Thomas 190996

16.    So long as the Debtor is not in default of its obligations under this Consent Order, the Debtor may use the Collateral in the ordinary course of business. The Debtor agrees not to engage in any use of the Collateral other than in the ordinary course of business, that it will properly maintain the Collateral and that the Collateral will not be used by, or leased to, any entity other than the Debtor. For the purposes of this Consent Order, "ordinary course of business" shall mean all uses made of the Collateral by the Debtor prior

to the filing of the Voluntary Petition, including, without limitation, cattle operations, recreational and sporting uses, short-term vacation leasing of cottages and residential buildings, and continuation of joint venture operations with Three Trees Ranch, Inc.

17.     The provisions of this Consent Order shall be binding upon the Debtor and its successors and assigns, with the exception of any Chapter 11 or Chapter 7 Trustee who may be appointed in this case.  By entry hereof, the Debtor has waived all rights to seek a re-determination regarding any issue addressed hereby.

18.     MLIC expressly reserves its rights and interests in the Collateral.

19.     The Debtor shall make the Collateral available to MLIC or its agents for inspection at a time reasonably convenient to the Debtor and MLIC.

20.     The Debtor shall maintain adequate comprehensive insurance on the Collateral designating MLIC as the loss payee.  Within seven (7) days of entry of this Consent Order, the Debtor shall provide to MLIC proof of said insurance.

21.     While this Chapter 11 case is pending, the Debtor agrees to, and will adhere to, the following non-monetary terms and obligations:

1.     Timely payment of all property taxes;

2.     Adhere to all insurance obligations;

3.     Maintain the property in the condition that existed as of the date of the filing of petition, i.e., continue to use the property in the ordinary course as defined above, including:

a.     All water rights subject to the mortgage are in full force and effect;

b.     All cattle grazing permits and rights are still in good standing;

c.     The operation of the property is not in violation of any applicable federal, state or local laws, statutes, rules or regulations;

-5-

d.      With regard to environmental issues, to Debtor's knowledge and belief, no portion of the mortgaged property has been used for production, release, storage or disposal of hazardous or toxic waste substances or materials; and

e.      Neither the Debtor, nor any tenant or other person using or occupying the property, will generate, store, and/or otherwise deal with hazardous or toxic waste substances and materials on the property.

22.      Unless the Debtor defaults as provided for herein, the Debtor shall have through and including October 31, 2016 within which to market and sell the Collateral.  The automatic stay of 11 U.S.C. § 362 shall automatically terminate on October 31, 2016, if not before pursuant to the terms herein, or unless agreed to otherwise by MLIC, without further Order or Notice of this Court and MLIC shall be permitted to pursue its rights and remedies under the Loan Documents and state law with respect to the Collateral.    Upon termination of the automatic stay, the Debtor and Stanley E. Thomas ("Thomas") will not oppose in any way MLIC's exercise of its rights and remedies as to the Collateral, whatever they may be, including, but not limited to, preservation of the Collateral pursuant to the Loan Documents, and the Debtor and Thomas shall vacate and remove all personal property from the Collateral.

23.      Should the Debtor fail to comply with any of the terms hereof, the Debtor shall be in Default under this Order, MLIC shall be permitted to recover and dispose of the Collateral pursuant to applicable State law only after submitting a Delinquency Motion and Affidavit of Default (as more particularly described below) and the entry of an Order lifting the automatic stay of 11 U.S.C. § 362 in the following manner:

(A)      MLIC shall serve the Debtor and the Debtor's counsel of record via overnight delivery with written notice of the specific facts of the delinquency (the "Delinquency

-6-

Notice"), which notice may be contained in a letter but shall:

    (1)    if the default is curable, state that the Debtor may cure the delinquency within fifteen (15) calendar days of the date of said notice; and

    (2)    specifically provide the correct instructions for delivering any payment or document required by the terms of this Consent Order.

(B)    If the Debtor fails to cure the delinquency within fifteen (15) calendar days of the date of said Delinquency Notice, or if Default is incurable, counsel for MLIC may present to this Court, after service on both the Debtor and the Debtor's counsel:

    (1)    a motion supported by an affidavit which avers the specific details of the delinquency, together with:

    (2)    a proposed Order (the motion, affidavit, copy of the Delinquency Notice and the proposed Order are herein collectively referred to as the "Delinquency Motion").

(C)    Upon presentation of said Delinquency Motion, this Court shall enter an Order lifting the automatic stay as to the Collateral, without further notice or hearing, and said Order shall become effective immediately upon entry.

24.    As evidenced by the Certificate of Service filed with this Court, MLIC has served copies of its Motion upon the Debtor, counsel for the Debtor, the twenty largest general unsecured creditors scheduled by the Debtor, and the United States Trustee.

25.    Nothing contained in this Consent Order shall be deemed or construed as a waiver by MLIC of its right to seek additional relief or other relief in this Chapter 11 case,

including, without limitation, the right to seek a dismissal or conversion of this Chapter 11 case or to seek the appointment of a trustee or examiner.

Upon consideration of the Motion and the stipulations of the parties, it is hereby ORDERED that the automatic stay provisions of 11 U.S.C. § 362 of the Bankruptcy Code are hereby modified as to MLIC to the extent necessary to implement the provisions of this Consent Order, thereby permitting MLIC, *inter alia,* to receive funds from the Debtor for application to obligations owed by the Debtor under the Loan Documents and to implement the other provisions hereof. It is further

ORDERED that the Debtor is authorized and directed to pay MLIC adequate protection payments to be applied to interest accruing post-petition on the Collateral as set forth above. It is further

ORDERED that the foregoing stipulations are approved and adopted and the agreement of the parties as set forth herein is made Order of this Court. It is further

ORDERED that this Order shall be filed under seal and shall remain under seal until further order of this court.

END OF DOCUMENT

Prepared and submitted by:

*/s/ Gary A. Barnes*
Gary A. Barnes
Georgia Bar No. 038575
gbarnes@bakerdonelson.com
Ron C. Bingham, II
Georgia Bar No. 057240
rbingham@bakerdonelson.com
Monarch Plaza, Suite 1600
3414 Peachtree Road, N.E.
Atlanta, Georgia 30326
404.577.6000 (Telephone)
404.221.6501 (Facsimile)

*Counsel for MLIC ASSET HOLDINGS, LLC
and MLIC CB HOLDINGS, LLC*

Consented to:

 /s/ Ward Stone, Jr.
Ward Stone, Jr.
Georgia Bar No. 684630
wstone@stoneandbaxter.com
Matthew S. Cathey
Georgia Bar No. 759547
mcathey@stoneandbaxter.com
STONE & BAXTER, LLP
Suite 800 Fickling & Company Bldg
577 Mulberry Street
Macon, GA 31201
478.750.9898 (Telephone)
478.750.9899 (Facsimile)

*Counsel for Fourth Quarter Properties 86, LLC*

Distribution List:

Fourth Quarter Properties 86, LLC
45 Ansley Drive
Newnan, GA 30263

Ward Stone, Jr., Esq.
Matthew S. Cathey, Esq.
Stone & Baxter LLP
Suite 800 Fickling & Company Bldg
577 Mulberry Street
Macon, GA 31201

R. Jeneane Treace, Esq.
Office of the United States Trustee
362 Richard Russell Bldg.
75 Ted Turner Drive, SW
Atlanta, GA 30303

Gary A. Barnes, Esq.
Ron C. Bingham, II, Esq.
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
3414 Peachtree Road, NE
Monarch Plaza, Suite 1600
Atlanta, Georgia 30326

**Exhibit 3**

**Little Jennie Marketing Efforts Report**



| Marketing Efforts | Date | Content |
|---|---|---|
| Custom Bespoke Marketing Plan 2016 | | Bespoke Marketing Plan 2016 |
| Jackson Hole Daily Ad | Summer 2016 | Daily Ad – April 4<br>June 1<br>July 15<br>September 7<br>October 12 |
| JHREA Summer Catalog Full Page and Premium Position | June 2016 | JHREA Catalog of Fine Properties<br>Page 89 of 132<br>Page 130 of 132 |
| Web slide show on Christie's homepage | Ongoing through 2016 | Christie's Website Homepage Slideshow (screenshot of slideshow)<br><br>Christie's Website  (link to homepage with slideshow) |
| Christie's Featured Properties Page | Ongoing through 2016 | Featured Properties |
| Preferred Placement on Search Results page for Jackson Hole and Wyoming | Ongoing through 2016 | Jackson Hole Search Results (screenshot)<br><br>Wyoming Search Results (screenshot) |
| Wall Street Journal Ad | May 2016 | Editorial Feature (proof) |
| 4 page property brochure distributed at Hong Kong Auctions | October 24-30, 2016 | |
| Christie's International Webpage Visits and Little Jennie Property page visits | May 2016 | Property Webpage Visits |
| The Land Report | Summer and Fall 2016 | Western Ranches section in the Land Report – Summer 2016 |

JACKSON HOLE
REAL ESTATE
ASSOCIATES

CHRISTIE'S
INTERNATIONAL REAL ESTATE

LUXURY ▪ COMMERCIAL ▪ RANCHES

LIVEJACKSONHOLE.com
LEGACY PROPERTIES

| | | |
|---|---|---|
| | | Western Ranches section in the Land Report – Coming Fall 2016 |
| JH News and Guide ad placement | Summer 2016 | Full Page Ad<br>Fall Arts Festival Full Page Ad |
| Continued prominent placement in JHREA and LiveJacksonHole website | Ongoing through 2016 | JHREA Website placement (screenshot)<br><br>LiveJacksonHole Website placement  (screenshot) |
| Promotion in Mountain Retreats Lifestyle Booklet | October 2016 | Booklet being finalized next week for distribution |
| Promotion in monthly real estate e-newsletter sent to Christie's clients and real estate subscribers | Summer 2016 | Beautiful Landscapes E-newsletter – July 2016 |
| Promotion in Art + Walls (monthly real estate e-newsletter set to senior Christie's Business Getters) | Summer 2016 | July 2016 Art & Wall E-newsletter |
| Promotion on corporate social media channels | Summer 2016 | JHREA Instagram Post / Part 2<br>Leverage Global Partners Instagram Post<br>Leverage Global Partners Facebook Post<br>LiveJacksonHole Facebook Post |
| Promotions on Wall Street Journal, NY Times, Financial Times, Prop Go Luxury, Mansion Global websites | Ongoing through 2016 | NY Times<br><br>Property Go Luxury |
| Promotion on Luxury Defined blog | As available when appropriate themes are available | Little Jennie Ranch in Luxury Defined<br><br>Luxury Defined Blog – September 2016 |
| Updated JHREA property brochure | Ongoing through 2016 | Little Jennie Ranch Brochure |
| Auction House Exposure | Ongoing through 2016 | Auction House Exposure |

| Email campaign | Summer 2016 | Wyoming Legacy Ranch For Sale  - May 21, 2016 |
|---|---|---|
| Promotion at Events (CIRE Global Annual Conference, Christie's Hong Kong Auctions, Art Southampton, Concours d'Elegance) | Summer 2016 | Awaiting images from the NY office from the conference and other events |
| Featured on Leverage Social Media for a Property Highlight | May 23, 2016 | Property Highlight! Facebook, Google+, Twitter, Instagram |
| Pure West MT Magazine | | Little Jennie Ad in the Ranch Section |
| Christie's International Real Estate Website Homepage Carousel | September 2016 | Little Jennie 15 second Carousel Video |

**Exhibit 4**

**News Articles Regarding the Cliff Creek Fire**

# InciWeb - Incident Information System

## Cliff Creek Fire

| ANNOUNCEMENT |
|---|
| **Area Closure Lifted**<br>The Emergency Area Closure Order for the Cliff Creek Fire was terminated Tuesday, Sept. 13, 2016. Currently, there are no road, trail, or area closures associated with this more |

**INCIDENT UPDATED 9/27/2016**

## Approximate Location

43.239 latitude, -110.491 longitude zoom to incident



## Incident Overview

**Bondurant, WY –** The Cliff Creek fire was discovered on the Bridger-Teton National Forest at 2:30pm on Sunday, July 17. The fire was reported approximately 5 miles north of the town of Bondurant, Wyoming.

**No Closures currently in effect!** The emergency area closure order was terminated Sept. 13, 2016 after the fire received measurable amounts of precipitation.



Image options: [ Enlarge ] [ Full Size ]

### Basic Infomation

| Current as of | 9/27/2016, 1:36:08 PM |
|---|---|
| Incident Type | Wildfire |
| Cause | Lightning |
| Date of Origin | Sunday July 17th, 2016 approx. 02:30 PM |
| Location | 5 miles north of Bondurant, Wyoming |
| Incident Commander | Phil Karius |
| Incident Description | Wildfire |

### Current Situation

| Total Personnel | 2 |
|---|---|
| Size | 34,313 Acres |
| Percent of Perimeter Contained | 97% |
| Estimated Containment Date | Sunday October 30th, 2016 approx. 12:00 AM |
| Fuels Involved | Timber and understory litter. Large numbers of insect damaged trees. |
| Significant Events | The area closure was terminated Tuesday, Sept. 13, 2016. |

Case 16-01035-whd    Doc 1    Filed 11/18/16    Entered 11/18/16 16:42:34    Desc Main Document      Page 44 of 82

**Outlook**

| | |
|---|---|
| **Planned Actions** | Crews will continue to monitor fire activity. |
| **Projected Incident Activity** | Minimal fire activity, smoldering, has been observed. |
| **Remarks** | The Emergency Area Closure has been lifted. No closures are in effect. |

       

Content posted to this website is for information purposes only.

Case 16-01035-whd   Doc 1   Filed 11/18/16   Entered 11/18/16 16:42:34   Desc Main
Document   Page 45 of 82

# InciWeb - Incident
# Information System

## Cliff Creek Fire News Release

### Cliff Creek Fire near Bondurant, Wyoming closes Highway 191/89

**Incident:** Cliff Creek Fire Wildfire
**Released:** 7/17/2016

**Bondurant, Wyo., July 18, 2016** – Today, the Cliff Creek fire was discovered on the Bridger-Teton National Forest at 2:30pm. The fire was reported approximately 5-miles north of the town of Bondurant Wyoming.

Interagency firefighters are working to suppress the fire. In one hour the Cliff Creek fire grew from 5 acres to 15 acres. Firefighters have closed Highway 89/191 north of Bondurant, Wyoming due to heavy smoke and active fire jumping over the highway.

The fire is burning in think, continuous fire and is torching groups of trees. Group torching is when a stand of trees become engulfed in fire and all burn up at the same time, causing large flames in the treetops.

The Bridger-Teton has ordered a Type 1 firefighting crew and a Type 1 helicopter. Handcrews are a diverse team of career and temporary agency employees with solid reputations as multi-skilled professional firefighters. The crews consist of 18 - 20 men and women and serve as the infantry of wildland fire forces. Working side by side, the crews main responsibilities are to construct a "fireline" – a strip of land cleared of flammable materials and dug down to mineral soil – around wildfires to control them, burn out fire areas, and mop up after the fire. Type 1 handcrews crews draw specialized assignments that reflect their higher levels of experience and training, and they're dispatched nationwide to fires. Type 1 helicopters carry 15 or more passengers and carry 700 gallons of water and some carry even more.

Visit http://inciweb.nwcg.gov/incident/4865/ for more information.

       

Content posted to this website is for information purposes only.

10/31/2016   Case 16-01035-whd   Doc 1   Filed 11/18/16   Entered 11/18/16 16:42:34   Desc Main
Document   Page 46 of 82
Sublette Examiner Cliff Creek Fire now 81 percent contained

# Cliff Creek Fire now 81 percent contained

Posted: Monday, Aug 1st, 2016
BY: Joy Ufford

BONDURANT - The Cliff Creek Fire enters its third week with 29,018 patchwork acres mapped as burned and as of Monday is considered 81 percent contained.

A controlled burn on the south flank of upper Dell Creek earlier in the week flared up Sunday evening around 7:30 p.m., with winds from the west-southwest, but it quickly subsided as darkness fell.

That particular preventative burn was started past the east end of Little Jennie Ranch hayfields between Shoal and Dell creeks, one of numerous proactive controls set to burn hillsides from the valley up in case the northeast-headed fire jumped ahead, according to fire officials. Spot fires were



SHOPPING SURVEY

**Enter to Win $2,000**



*To enter now, go to:*
**www.pulsepoll.com**
*and use Survey Code:* **202**



visible in Hoback Basin as isolated pines torched occasionally over the weekend.

The lightning-sparked fire was discovered around 2:30 p.m. on Sunday, July 17, next to Highway 191 at Cliff Creek. The fire has threatened private property and residences but only one hayshed was lost in the blaze's first night.

Granite Creek's Jack Pine summer homes are still evacuated as firefighters try to fight fire with fire, having already surrounded the buildings with an extensive sprinkler system.

*For the complete article see the 08-02-2016 issue.*

# liff Creek Fire continues to spread north of Bondurant, Wyoming

**(*UPDATED*** *at 11 a.m. MDT July 22, 2016)*

The DeMasters Type 2 Incident Management Team released a little more information about the Cliff Creek Fire that has forced the closure of Highway 189/191, one of the highways leading to Yellowstone and Grand Teton National Parks. The size is now 11,534 acres. One structure has burned.

Teton County Emergency Management issued a mandatory evacuation order for the Granite Creek area including Granite Campground, Granite Hot Springs, Jack Pine Summer Homes, and the Safari Club.

For official evacuation information check the Teton County Emergency Management web site.

The U.S. Forest Service and the Incident Management Team state in the update, as they have before, that "The fire is being actively suppressed", but that is not entirely true. The Bridger-Teton National Forest has directed the Team to use a "confine/contain" strategy. This means they will attempt to herd it around and put out portions of the fire edge as it becomes necessary. But the objective is not to fully suppress the fire. They are no doubt "actively suppressing" some sections of the fire where it endangers private property and structures, but "confine/contain" usually refers to allowing some areas of a fire to spread unconstrained.  They may decide to allow the fire to advance unfettered to the east and northeast into the higher elevations above 9,000 feet where it will begin to run out of fuel.

It was no accident that the "actively suppressing" language was chosen for the press release. The U.S. Forest Service should not issue intentionally misleading information to the public.

****

**(*UPDATED*** *at 7:53 a.m. MDT July 22, 2016)*



*The red dots represent heat detected by a satellite on the Cliff Creek Fire at 2:55 a.m. MDT July 22. The red line was the perimeter about 52 hours before. Click to enlarge.*

As the Cliff Creek Fire burns into its sixth day the U.S. Forest Service and DeMasters' Type 2 Incident Management Team are not releasing much information about the fire which has closed for several days Highway 191, a major highway leading to Yellowstone and Grand Teton National Parks. The fire 12 air miles southeast of Hoback, Wyoming is not being totally suppressed, but is a "confine/contain" fire, which means they will attempt to herd it around and put out portions of the fire edge as it becomes necessary.



Case 16-01035-whd    Doc 1    Filed 11/18/16    Entered 11/18/16 16:42:34    Desc Main
Document    Page 49 of 82



**Minnesota ICS** @mnics

[ Follow ]

#mifc crew 3 @ 10,000+ acre #CliffCreekFire with 5%
containment (Dave Bell photo) #mnfire bit.ly/29V4a54

9:59 PM - 21 Jul 2016

        1         2

One structure and 10,118 acres have burned. Evacuations for the community of Bondurant have been lifted.

The fire was discovered on the Bridger-Teton National Forest at 2:30pm on Sunday, July 17, approximately 5 miles north of the town of Bondurant Wyoming.





**Truckee Meadows Fire** @TMFPD

[ Follow ]

We are proud to have TMFPD resources assisting on the #CliffCreekFire in Wyoming right now. #MutualAid

8:35 PM - 21 Jul 2016

        2         12

It is being managed by 620 personnel, 16 hand crews, 33 engines, and 7 helicopters at a cost to date of $2,200,000.

****

*(**UPDATED** at 11:54 a.m. MDT July 20, 2016)*



*Cliff Creek Fire July 20, 2016. USFS photo.*

The Cliff Creek Fire 3 miles north of Bondurant, Wyoming continued to spread over the last 24 hours to the north and east. It has consumed approximately 7,671 acres and one structure.

Tuesday morning DeMasters' Type 2 Incident Management Team 7 assumed command of the fire. Their instructions from the Bridger-Teton National Forest are not to fully suppress the fire but to confine and contain it.

Case 16-01035-whd    Doc 1    Filed 11/18/16    Entered 11/18/16 16:42:34    Desc Main
Document    Page 51 of 82



*Map of the perimeter of the Cliff Creek Fire at 1 a.m. July 20, 2016.*

**Exhibit 5**

**Offer to Purchase**

## AGREEMENT FOR PURCHASE AND SALE OF REAL ESTATE

THIS AGREEMENT FOR PURCHASE AND SALE OF REAL ESTATE (the "**Agreement**") is made and entered into as of the date that the Seller has executed this Agreement as indicated by the date next to Seller's signature block below (the "**Effective Date**") by and between Fourth Quarter Properties 86, LLC, a Georgia limited liability company ("**Seller**"), and KJ Overseas Investment Limited, a Chinese private limited company ("**Purchaser**").

For and in consideration of the mutual covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller hereby agree as follows:

1. **Purchase and Sale**. Upon and subject to the terms of this Agreement, Seller shall sell to Purchaser and Purchaser shall purchase from Seller that certain approximately 3011 acre tract of land situated in Sublette County, Wyoming, known as the Little Jennie Ranch, as more particular described in Exhibit A attached hereto and made a part hereof together with all rights and appurtenances pertaining thereto ("the **Land**"), (including, without limitation, all other appurtenant easements over any other property and all rights-of-way, development rights, water rights, mineral rights, grants, rights, interests, privileges, tenements, hereditaments, and other rights which are appurtenant to the Land or in any way appertaining thereto, including without limitation, the permits and rights described in Exhibit A to that certain First Mortgage and Security Agreement from Seller to Metropolitan Life Insurance Company dated December 18, 2006); all buildings, improvements, landscaping and fixtures located on the Land and any sculptures, art work and signs located on the Land and owned by either Seller (collectively, the "**Improvements**"); and all equipment, machinery, furnishings, supplies, and other tangible personal property owned by either Seller which is now or hereafter located at or within the Land or the Improvements and used in connection with the operation or occupancy thereof including, (herein referred to collectively as the "**Personal Property**"). All of the foregoing Land, Improvements, Personal Property, are collectively referred to herein as the "**Property**."

2. **Purchase Price**. The consideration (the "**Purchase Price**") for the sale and conveyance of the Property shall be Thirty-Five Million dollars ($35,000,000), payable in cash at Closing.

3. **Survey and Title Policy**.

    (a)    Within fourteen (14) days after the Effective Date, Purchaser, at its cost, shall deliver or cause to be delivered to Seller a Commitment for Title Insurance issued by a national title insurance company reasonably acceptable to Seller (the "**Title Company**") together with true and legible copies of all easements, restrictions and other items referred to as exceptions in the Commitment for Title Insurance (collectively, the "**Commitment**").

(b)      Purchaser shall, at its sole expense, have the Property surveyed and deliver to Seller a current ALTA survey (the "**Survey**") of the Property made on the ground by a registered, professional land surveyor approved by the Title Company.

(c)      Any items constituting an encumbrance upon or adversely affecting title to the Property as reflected by the Commitment or the Survey shall constitute an exception to title. No later than ten (10) days prior to expiration of Feasibility Period, Purchaser shall notify Seller writing of its objection to any such exceptions to title or disapproval of the Survey. If Purchaser does not timely make any such objections, Purchaser shall be deemed to have accepted such matters shown on the Commitment and/or Survey. Seller shall have seven (7) days after receipt of Purchaser's objection notice during which to undertake in writing to cure such objections prior to Closing (and, if Seller fails to respond in writing, Seller shall be deemed to have refused to cure such objections). If Seller does not so agree to cure any such objections and Purchaser does not terminate this Agreement prior to the expiration of the Feasibility Period, Purchaser shall be deemed to have waived such objections. Seller agrees to remove any exceptions or encumbrances to title voluntarily created by Seller after the Effective Date. Any exceptions to title not objected to by Purchaser in the manner and within the time period specified in this section shall be deemed accepted by Purchaser. The phrase "Permitted Encumbrances" shall mean those exceptions to title set forth in the Commitment and which have been accepted or deemed accepted or waived by Purchaser.

(d)      At the Closing, Purchaser shall obtain, at Purchaser's sole cost and expense, with an Owner's Title Policy (the "**Title Policy**") dated the date of Closing, in the amount of the Purchase Price and insuring good and indefeasible title to the Property to be in Purchaser in fee simple subject to no exceptions other than Permitted Encumbrances. Seller shall execute at Closing an affidavit on the Title Company's standard form so that the Title Company can delete any standard exceptions as to parties in possession, unrecorded easements, liens and leases and similar matters. The Title Policy may be delivered after the Closing if at the Closing the Title Company issues a currently effective, duly-executed "marked-up" Commitment and irrevocably commits in writing to issue the Title Policy in the form of the "marked-up" Commitment promptly after the Closing Date.

4.      **Earnest Money**.   Within five (5) business days after the Effective Date, Purchaser shall deposit with the Title Company Five Hundred Thousand Dollars ($500,000) as earnest money (the "**Earnest Money**"). The Title Company shall, at the election of Purchaser or Seller, invest the Earnest Money in an interest bearing account. The Earnest Money shall include all interest thereon. In the event this Agreement is closed, the Earnest Money shall be applied in payment of a part of the cash portion of the Purchase Price to be paid at the Closing. In the event this Agreement is not closed, the Earnest Money shall be disbursed in accordance with the provisions of this Agreement.

5.      **Independent Contract Consideration**.   Notwithstanding any other provision of this Agreement to the contrary, in the event this Agreement is terminated by either party prior to Closing pursuant to any right to do so in this Agreement, or, if not so terminated, at the Closing, One Hundred Dollars ($100) ("**Independent Contract Consideration**") of the Earnest Money shall be paid to Seller, which amount the parties bargained for and agreed to as consideration for Purchaser's exclusive right to inspect and purchase the Property pursuant to this Agreement and

**2** | P a g e

for Seller's execution, delivery and performance of this Agreement. The Independent Contract Consideration is in addition to and independent of any other consideration or payment provided in this Agreement, is nonrefundable, and it is fully earned and shall be retained by Seller notwithstanding any other provision of this Agreement, provided, the Independent Contract Consideration shall be applied as a credit to the Purchase Price at Closing.

6.    **Seller's Representations, Warranties and Covenants**.  Seller represents and warrants to and covenants with Purchaser that:

(a)    Seller has good and indefeasible fee simple title to the Property, and Seller shall at the Closing hereunder convey to Purchaser by Special Warranty Deed, good and indefeasible fee simple title to the Property, subject only to the Permitted Encumbrances. The phrase "good and indefeasible fee simple title" as used herein means fee simple record title which a title insurance company licensed to do business in the State of Wyoming will insure at its regular rates, subject to no exceptions other than (1) zoning ordinances affecting the Property, (2) the Permitted Encumbrances, and (3) such other matters as are disclosed by Purchaser's title examination and/or Survey and not timely objected to by Purchaser.

(b)    Seller has, without notice to or consent or joinder of any other person or entity, other than the Bankruptcy Court (as described below), the full right, power and authority to enter into and perform this Agreement, including full right, power and authority to sell and convey the Property to Purchaser.  This Agreement constitutes the legal, valid and binding obligation of Seller enforceable in accordance with its terms. The parties acknowledge that on January 22, 2015, Seller filed a Chapter 11 bankruptcy case in the United States District Court for the Northern District of Georgia, Atlanta Division (the "Bankruptcy Court"), Case No: 15-10135 (the "Bankruptcy Case").  Seller's signature hereto shall indicate that Seller obtained the approval of the Bankruptcy Court to enter into this Agreement.

(c)    To Seller's actual knowledge, there are no adverse or other parties in possession of the Land.

(d)    Seller's execution, delivery and performance of this Agreement (i) are within Seller's power and authority and have been duly authorized and (ii) will not conflict with, or with or without notice or the passage of time, or both, result in a breach of any of the terms and provisions of or constitute a default under any Legal Requirement, indenture, mortgage, loan agreement or instrument to which Seller is a party or by which Seller or the Property is bound.

(e)    To Seller's actual knowledge, other than the Permitted Exceptions or as otherwise disclosed herein, there are no unrecorded written or oral contracts or other agreements to which Seller is a party with respect to the Property that cannot be canceled by Purchaser without liability on or after the Closing.

(f)    Seller has not granted any other person the right to acquire the Property, and to Seller's actual knowledge, no person has any right to acquire any interest in the Property.

(g)    To Seller's actual knowledge, there are no Hazardous Substances (hereinafter defined) located in, on, under or about the Land. To Seller's actual knowledge, The

3 | Page

Land has not been used as a landfill nor for the storage, production, generation, handling, discharge or disposal of Hazardous Substances.  There are no underground storage tanks on the Land.  As used herein, **"Hazardous Substances"** mean (i) any oil, flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials or pollutants which (A) pose a hazard to the Land or to persons on or about the Land or (B) cause the Land to be in violation of any Environmental Law (hereinafter defined) and (ii) any chemical, material or substance defined as or included in the definitions of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "toxic substances" or words of similar import under any applicable Environmental Law. Environmental Laws mean any federal, state or local laws, ordinances, regulations or policies relating to the environment, health and safety, any Hazardous Substances (including, without limitation, the use, handling, transportation, production, disposal, discharge or storage thereof) or to environmental conditions in, on, under or about the Property, including, without limitation, soil and groundwater conditions.

(h)     During the pendency of this Agreement, Seller will not (i) enter into any contract or instrument that will affect title to the Property or create an obligation affecting Purchaser or the Property subsequent to the Closing; (ii) alter the zoning affecting the Land; or (iii) alter or amend any preliminary or final plat covering any portion of the Property (other than as required by this Agreement).

(i)     The warranties, representations and covenants contained in this Agreement shall survive the Closing and shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto for six (6) months following Closing.

(j)     Each of said warranties and representations is true and correct as of the date hereof and shall be true and correct as of the date of Closing in all material respects.

7.     **Due Diligence Materials; Feasibility Period**.

Seller shall provide to Purchaser within seven (7) days of the Effective Date copies of any soil reports, any and all topographical survey maps and engineering studies for the Land, in Seller's actual possession that have been prepared by and on behalf of Seller, any and all written information relating to soil and subsurface conditions with respect to the Land, in Seller's actual possession, environmental assessments, engineering studies and schematics, zoning and permit applications, wetlands assessments, and tax bills for the last year, and any and all documents similar in nature relating to the Property that are in Seller's possession or control.  Any such items provided by Seller to Purchaser shall be kept confidential by Purchaser until Closing (except that Purchaser may disclose such information to its consultants for the purpose of performing its inspection activities only), and, in the event that Closing does not occur, Purchaser shall return all such information to Seller.  If Purchaser or any of its representatives become legally compelled to disclose any of the above referenced information, Purchaser shall provide Seller with prompt prior written notice of such requirement so that Seller may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this agreement.  If such protective order or other remedy is not obtained, or if Seller waives compliance with the provisions of this agreement, Purchaser shall furnish only that portion of the

**4** | P a g e

information that Purchaser is advised by its counsel is legally required and will exercise its best efforts to obtain reliable assurance that confidential treatment will be accorded same.   The foregoing confidentiality restriction shall not apply to any information which is or becomes in the public domain through no action or inaction on the part of Purchaser.  Purchaser's obligations against disclosure under this agreement will expire three (3) years from the date of this agreement for any information not constituting a "trade secret" as defined by the Uniform Trade Secrets Act; and if any of such information constitutes a "trade secret" under the Uniform Trade Secrets Act Purchaser's obligations hereunder shall remain until the later of three (3) years and the date at which such information ceases to constitute a "trade secret."

Seller agrees that during the period commencing on the Effective Date and ending thirty (30) days thereafter (the "**Feasibility Period**"), Purchaser, at its sole cost and risk, shall have the right to go on the Property or any part thereof to inspect the Property and to make all such other inspections, surveys, tests, market or other studies (including environmental) as Purchaser deems necessary or desirable to determine if the Property is suitable for use by Purchaser, including, without limitation, to determine the water rights, mineral rights, grazing permits related to the Land; provided that Purchaser shall not perform any invasive tests without the advance written consent of Seller.  Purchaser shall provide a copy of any written inspection, test, report or summary to Seller upon Seller's written request therefor.  If Purchaser shall determine in the exercise of its sole discretion that Purchaser does not desire to purchase the Property for any reason whatsoever, Purchaser shall have the right to terminate this Agreement by written notice to Seller prior to the end of the Feasibility Period.  In such event, the Earnest Money shall forthwith be returned to Purchaser free and clear of all rights and claims of Seller with respect thereto, and neither party hereto shall have any further liability or obligation hereunder.  Should Purchaser fail to terminate the Agreement in the manner and within the time provided, Purchaser shall have waived its right to terminate the Agreement under this section.  Purchaser will repair any damages resulting to the Property caused by such tests, surveys, inspections and studies or reimburse Seller for all reasonable expenses incurred by Seller in repairing such damages if Purchaser does not promptly repair such damages after written notice of such damages has been delivered by Seller to Purchaser.   The foregoing agreement of indemnity, repair and reimbursement shall survive any termination of this Agreement.  Nothing herein is intended to obligate the Purchaser to remediate or clean up any environmental or other condition existing at the Property or discovered or uncovered by Purchaser (or its agents) during its investigation of the Property, provided same was not exasperated by Purchaser or its agents.

Except as expressly provided herein and in the deed, the Property shall be sold AS IS, WHERE IS and Purchaser acknowledges that Seller has not made, does not make and specifically disclaims any representations and warranties, express or implied, regarding the condition of the Property or the suitability of the Property for Purchaser's purposes, including, without limitation any and all representations and warranties regarding environmental conditions.  During the Feasibility Period, Purchaser shall satisfy itself as to all conditions of the Property, all limitations (if any) on its development, zoning matters and all other information Purchaser may desire to decide whether to close the purchase of the Property.

8.    **Closing**.

(a)    The closing hereunder shall take place at the office of the Title Company on the day that is thirty (30) days after expiration of the Feasibility Period, or at such other time or place as shall be mutually agreed upon by the parties in writing.  References in this Agreement to the **"Closing"** or the **"Closing Date"** shall mean said time and place.

(b)    In addition to all other conditions set forth herein, the obligation of Purchaser to consummate the transaction contemplated hereunder shall be contingent upon the following:

(i)    Seller's representations and warranties contained herein shall be true and correct as of the Effective Date and the Closing Date;

(ii)    Other than the Bankruptcy Case, there shall exist no actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, pending or threatened against Seller that would materially and adversely affect the operation or value of the Property or Seller's ability to perform its obligations under this Agreement;

(iii)    Seller shall have duly performed or complied with all material covenants, acts and agreements to be performed or complied with by Seller on or prior to Closing pursuant to the terms of this Agreement.

If any condition to Purchaser's obligation to proceed with the Closing hereunder has not been satisfied as of the Closing Date, Purchaser must, in its sole discretion, (i) terminate this Agreement and receive a full refund of the Earnest Money immediately upon request without the necessity of obtaining any consent or release by Seller by delivering written notice to Seller on or before the Closing Date or (ii) elect to close, notwithstanding the nonsatisfaction of such condition.

(c)    At the Closing, Seller shall deliver in escrow to the Title Company the following:

(i)    a duly executed Special Warranty Deed in recordable form conveying the Land to Purchaser free and clear of any liens or encumbrances except the Permitted Encumbrances;

(ii)    a duly executed Bill of Sale conveying Seller's interest in the Improvements and other Personal Property to Purchaser free and clear of any liens or encumbrances created by or through Seller;

(iii)    a General Assignment, assigning Seller's interest in all permits contracts and intangibles used solely in connection with the Property, to Purchaser free and clear of any liens or encumbrances created by or through Seller including without limitation, the below permits:

**6** | P a g e

(1)   USDA Forest Service Grazing Permit No. 2-12 (Bridger-Teton National Forest)

(2)   USDA Forest Service Grazing Permit No. 4027 (Bridger- Teton National Forest)

(iv)   evidence of existence, organization and authority of Seller and the authority of the person executing documents on behalf of Seller reasonably satisfactory to Purchaser and the Title Company;

(v)   an affidavit as to Seller's non-foreign status as permitted by Section 1445(b)(2) of the Internal Revenue Code, as amended;

(vi)   a certificate executed by a duly authorized officer of Seller certifying that Seller's representations and warranties in Section 6 of this Agreement are true and correct in all material respects as of the Closing Date; and

(vii)   such other documents as Purchaser or the Title Company reasonably require in the consummation of this transaction.

(d)   At the Closing, Purchaser shall deliver in escrow to the Title Company the following:

(i)   the Purchase Price, less the Earnest Money that is applied to the Purchase Price, plus or minus applicable prorations, in immediate, same-day federal funds wired for credit into the Title Company's escrow account; and

(ii)   such other documents as Seller or the Title Company reasonably require in the consummation of this transaction.

(e)   On the Closing Date, Seller and Purchaser shall deposit with the Title Company executed closing statements consistent with this Agreement in form required by the Title Company. The Title Company's escrow fee shall be divided equally between and paid by Seller and Purchaser.

(f)   At the Closing, the Title Company shall deliver to Purchaser the Title Policy.

(g)   Seller shall deliver possession of the Property to Purchaser at the Closing, subject only to the Permitted Encumbrances.

(h)   Upon satisfaction or completion of the foregoing conditions and deliveries, and in accordance with written instructions to the Title Company by Purchaser and/or Seller (not inconsistent with this Agreement), the Title Company shall immediately record and

deliver the documents in this Section 8 above to the appropriate parties and make disbursements according to the closing statements executed by Seller and Purchaser.

        (i)     Ad valorem taxes on the Property for the year of Closing shall be prorated as of the Closing Date. Tax certificates reflecting payment of ad valorem taxes shall be furnished by Seller at Closing. Except as otherwise provided herein, all other costs, charges and expenses in connection with closing the transaction contemplated by this Agreement shall be allocated between Seller and Purchaser in accordance with customary practice in the County. If the Closing shall occur before the tax rate or the assessed valuation of the Property is fixed for the year of Closing, the apportionment of taxes shall be upon the basis of the tax rate for the preceding year applied to the latest assessed valuation. As soon as practicable after the tax rate and/or the assessed valuation of the Property has been fixed for the year of Closing, Seller and Purchaser shall make an appropriate adjustment to the tax proration made at Closing.

    9.    **Seller's Default**. In the event that sale of the Property hereunder is not consummated by reason of Seller's breach of any representation or warranty contained in this Agreement or failure to perform all obligations and conditions to be performed by Seller under this Agreement, Purchaser as its sole remedies, shall elect to either, (i) terminate this Agreement by written notice to Seller or (ii) enforce specific performance of this Agreement. If this Agreement is terminated by Purchaser pursuant to any right of termination given to Purchaser herein, the Earnest Money shall promptly be refunded to Purchaser.

    10.    **Purchaser's Default**. In the event that sale of the Property hereunder is not consummated by reason of Purchaser's breach or other failure to perform all obligations and conditions to be performed by Purchaser under this Agreement, the Seller shall have the right to retain the Earnest Money as liquidated damages for the breach of this Agreement as Seller's sole and exclusive remedy, such sum to be retained by Seller is the amount of damages that both Seller and Purchaser agree that Seller would sustain by reason of any default by Purchaser, as the amount of actual damages sustained by Seller would be difficult or impractical to determine.

    11.    **Commission**. Seller and Purchaser covenant and agree that no real estate commissions, finders' fees or brokers' fees have been or will be incurred in connection with this Agreement or the sale contemplated hereby. Each party hereby agrees to indemnify the other for any loss or damage due to the inaccuracy of any representation or warranty in this paragraph; this indemnity obligation shall survive Closing for one (1) year.

    12.    **Notices**. All notices required or permitted hereunder shall be in writing and shall be deemed to be delivered when actually received if personally delivered, when sent by fax properly addressed and machine generated confirmation of receipt is received or upon deposit with a recognized overnight courier service or in the United States Mail, postage prepaid, registered or certified mail, return receipt requested, addressed to Seller or Purchaser, as the case may be, as follows:

        If to Purchaser:      1208 Yingli International
                                 Jiefang Pi, Yuzhong District, Chongqing City
                                 Attention: Huan Yang
                                 Telephone No: +86-10-5718-0825

Fax No: +86-10-5718-0830

With a copy to:       NYSA Capital, LLC
                      12 Piedmont Center NE
                      Suite 420
                      Atlanta, Georgia 30305 USA
                      Attention:  Leslie LaValley, Vice President Capital Markets
                      Telephone No:404-239-2222
                      Fax No:  404-446-4730


If to Seller:         45 Ansley Dr, Newnan, GA 30263
                      Attn: Stanley E. Thomas
                      Telephone No.:(678) 423-5545
                      Fax No: (678) 423-5450

With a copy to:       Thomas Land & Development, LLC
                      45 Ansley Dr, Newnan, GA 30263
                      Attn: Kerri Miller, Esq.
                      Fax No: (678) 423-5450


Either party hereto may change the address for notice specified above by giving the other party three (3) days advance written notice of such change of address.

      13.    **Condemnation**.  If any material part of the Property is condemned, or if prior to the Closing, condemnation proceedings are threatened or commenced against any part of the Property, then Seller shall give written notice thereof to Purchaser, and Purchaser may elect to terminate this Agreement by written notice to Seller within fifteen (15) days after receipt of Seller's notice, whereupon the Earnest Money shall be returned to Purchaser, and neither Purchaser nor Seller shall have any further liability or obligation hereunder.  If Purchaser does not so terminate the Agreement, the obligations of the parties hereto shall not be affected, and Seller shall assign to Purchaser (or pay to Purchaser if such proceeds have been collected), at the Closing, all condemnation proceeds payable as the result of such proceedings.

      14.    **Miscellaneous**.

        (a)    **Construction and Interpretation**.  This Agreement shall be construed and interpreted in accordance with the laws of the State of Wyoming.

        (b)    **Amendment and Waiver**.  This Agreement may not be modified or amended, except by an agreement in writing signed by Seller and Purchaser.  The parties may waive any of the conditions contained herein or any of the obligations of the other party hereunder, but any such waiver shall be effective only if in writing and signed by the party waiving such condition or obligation.

**9** | P a g e

(c)    **Power to Execute**.  Each person executing this Agreement warrants and represents that he is fully authorized to do so.

(d)    **Assignment**.  This Agreement may not be assigned without the consent of Seller, but Purchaser may assign this Agreement to a business entity or trust of which Purchaser or an affiliate of Purchaser is a controlling member/partner/manager.  Upon such assignment and assumption by Purchaser's assignee, pursuant to an assignment and assumption instrument in form and substance reasonably satisfactory to Seller, of all of Purchaser's obligations under this Agreement, Purchaser shall be released from any liability or obligation hereunder.

(e)    **Binding Terms**.  This Agreement and the terms and provisions hereof shall inure to the benefit of and be binding upon the parties hereto and their legal representatives, successors and assigns.

(f)    **Entire Agreement**.  This Agreement, (including any exhibits and/or addenda hereto), constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith.  No covenant, representation or condition which is not expressed herein shall be binding upon the parties hereto or shall affect or be effective to interpret, change or restrict the provisions of this Agreement.

(g)    **Acknowledgement of Cancellation**.  Upon a termination or cancellation of this Agreement, both parties covenant and agree to execute such documents as either party may reasonably request to evidence such termination.

(h)    **Time**.  Time shall be of the essence with respect to the performance of this Agreement.  In computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included, and the last day of the period so computed is to be included.  If the end of any period or any date for performance of an obligation hereunder falls on a Saturday, Sunday or a day on which banks are required or permitted to close in Wyoming (a "**Holiday**"), the end of such period or the date for performance will be extended to the next day which is not a Saturday, Sunday or Holiday.

(i)    **Attorneys' Fees**.  In the event it becomes necessary for either party to file a suit to enforce this Agreement or any provision contained herein, the party prevailing in such action shall be entitled to receive, in addition to all other remedies or damages, reasonable attorneys' fees incurred in such suit.

(j)    **Counterparts**.  This Agreement may be executed in two or more identical counterparts, each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same instrument.

(k)    **Exhibits**. All exhibits and attachments attached hereto are incorporated herein by this reference.

*[SIGNATURES ON FOLLOWING PAGE]*

**10** | P a g e

Executed by Seller and Purchaser as of the Effective Date.

SELLER:

Fourth Quarter Properties 86, LLC, a Georgia
limited liability company

By : _____
Name: _____
Title: _____

Date:_____

PURCHASER:

KJ Overseas Investment Limited, a Chinese private
limited company

By:_____
Name: _Leslie La Valley_____
Title: _Vice President - Capital Markets_
Nysa Capital LLC -
for and on behalf of purchaser
as US agent

EXHIBIT A

## DESCRIPTION OF LAND AND PROPERTY

EXHIBIT "A"

TOWNSHIP 38 NORTH, RANGE 112 WEST, 6TH P.M., SUBLETTE COUNTY, WYOMING
SECTION 18: LOTS, 1, 2, 3, W½NE¼, S½SE¼NE¼, E½NW¼, NE¼SW¼, N½SE¼
SECTION 27: NW¼NW¼
SECTION 28: N½NE¼, S½NW¼, N½SW¼
SECTION 29: S½N½, N½S½, SE¼SW¼, SW¼SE¼
SECTION 30: LOT 2, E½NE¼, SW¼NE¼, SE¼NW¼

TOWNSHIP 38 NORTH, RANGE 113 WEST, 6TH P.M., SUBLETTE COUNTY, WYOMING
SECTION 13: S½NE¼, SE¼, S½SW¼, S½N½SW¼
SECTION 14: S½SE¼
SECTION 21: N½N½, S½NE¼, SE¼NW¼, N½SW¼, SW¼NW¼ EXCEPTING THEREFROM A PARCEL
BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:
BEGINNING AT THE SOUTHWEST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHWEST
QUARTER (SW¼NW¼) OF SECTION 21, TOWNSHIP 38 NORTH, RANGE 113 WEST OF THE 6TH P.M.,
WYOMING AND RUNNING IN A NORTHERLY DIRECTION 300 FEET TO A POINT ON THE WESTERLY LINE
OF SAID SOUTHWEST QUARTER OF THE NORTHWEST QUARTER (SW¼NW¼) OF SECTION 21,
TOWNSHIP 38 NORTH, RANGE 113 WEST OF THE 6TH P.M., WYOMING; THENCE AT RIGHT ANGLES IN
AN EASTERLY DIRECTION 200 FEET TO A POINT; THENCE AT RIGHT ANGLES IN A SOUTHERLY
DIRECTION 300 FEET TO A POINT; THENCE AT RIGHT ANGLES IN A WESTERLY DIRECTION 200 FEET
TO THE POINT OF BEGINNING.
SECTION 22: N½
SECTION 23: N½, SE¼
SECTION 25: SE¼NE¼
SECTION 26: NE¼NE¼

Together with all water and water rights, livestock watering systems and livestock tanks, ditches, and ditch rights used thereon or appurtenant to the above-described lands, including, but not limited to, the following:

| Permit No. | Source of Supply | Amount (cu. ft. per. sec.) | Priority Date |
|---|---|---|---|
| 7386 | Bowlsby Ditch No. 2 Hamilton Creek | 4.07 | 8/2/1906 |
| 10460 | Baker Ditch Jack Creek | 3.91 | 1/20/1911 |
| 10460 | Baker Ditch Jack Creek | 2.28 | 1/20/1911 |
| 10460 | Baker Ditch Jack Creek | .57 | 1/20/1911 |
| 10460 | Baker Ditch Jack Creek | 1.06 | 1/20/1911 |
| 13875 | Riling Ditch Dell Creek | 1.61 | 11/4/1915 |
| 14465 | Parody Ditch Dell Creek | .90 | 10/8/1916 |
| 16658 | Jones Ditch Jones Creek | .44 | 8/30/1923 |
| 18617 | Frank Ditch Jack Creek | 2.0 | 7/30/1954 |
| 20345 | Bosone Ditch Rock Creek | 1.08 | 6/12/1948 |
| 21260 | Hansen & Stultz Ditches Dell Creek | .53 | 8/11/1953 |
| 21261 | South Kearns & Riling Ditches / Dell Creek | 1.72 | 8/11/1953 |
| 21844 | Kearns Pipeline No. 1 Kearns Spring No. 1 | .8 | 4/15/1957 |
| 21845 | Kearns Pipeline No. 2 Kearns Spring No. 2 | .8 | 4/15/1957 |
| 21887 | Hearly Spring Pipeline Hearly Spring | .022 | 7/15/1957 |
| 22024 | Bull Pasture Ditch Jack Creek | .64 | 1/27/1959 |
| 22028 | Baker Spring Baker Spring Pipeline | .012 | 1/27/1959 |

(Exhibit A continued)

| Permit No. | Source of Supply | Amount (cu. ft. per. sec.) | Priority Date |
|---|---|---|---|
| 22805 | Horse Creek Ditch<br>Horse Creek | Supplemental Supply | 5/1/1963 |
| 23179 | Wickett Pipeline<br>Wickett Spring | .044 | 3/8/1968 |
| 4070 (Enlargement) | Enl. Stultz Ditch<br>Dell Creek | 1.06 | 1/19/1920 |
| 4070 (Enlargement) | Enl. Stultz Ditch<br>changed to Hansen Ditch<br>Dell Creek | 2.0 | 1/19/1920 |
| 4393 (Enlargement) | Enl. Stultz Ditch<br>Dell Creek | .64 | 12/3/1923 |
| 4522 (Enlargement) | Enl. Baker Ditch<br>Jack Creek | 1.53 | 1/6/1927 |
| 4933 (Enlargement) | Frank Enl. Baker Ditch<br>Jack Creek | .27 | 7/24/1934 |
| 5696 (Enlargement) | Enl. Stultz Ditch<br>Dell Creek | 1.70 | 7/31/1953 |
| 5697 (Enlargement) | Enl. Hansen Ditch<br>Dell Creek | .37 | 7/31/1953 |
| 6195 (Enlargement) | Enl. Parody Ditch<br>Dell Creek | .36 | 5/1/1963 |
| 8492 | Stultz Ditch<br>Dell Creek | 1.31 | 6/17/1908 |
| 8492 | Stultz Ditch<br>Dell Creek | not stated | 6/12/1908 |
| 21846 | Little Jennie Ditch<br>Parody Creek | 1.69 | 11/13/1957 |
| 5908 (Enlargement) | Enl. Riling Ditch<br>Dell Creek | 4.5 | 11/29/1956 |

| Permit No. | FacName | Date | Location |
|---|---|---|---|
| P78921W | Upper Ranch #3 | 1/19/89 | SENE, Sec. 29, T38, R112 |
| P110833W | Aqua 1 | 7/6/98 | NENW, Sec. 25, T38, R113 |
| P78920W | Bozeni Ranch Well #1 | 1/19/1989 | SWSW, Sec. 15, T38, R113 |

Attached hereto is the report from the Wyoming State Engineers office more particularly describing the above-referenced water rights.

**Exhibit 6**

**Email dated October 31, 2016 from Ward Stone**

**to Gary Barnes and Ron Bingham**

**Tom McClendon**

| | |
|---|---|
| **From:** | Matt Cathey |
| **Sent:** | Friday, November 18, 2016 2:06 PM |
| **To:** | Tom McClendon |
| **Subject:** | FW: Little Jennie Ranch and Metropolitan Life |

Matthew S. Cathey
Stone & Baxter, LLP
Fickling & Co. Building, Suite 800
577 Mulberry Street
Macon, Georgia 31201
(478) 750-9898
(478) 750-9899 (fax)

---

**From:** Barnes, Gary [mailto:gbarnes@bakerdonelson.com]
**Sent:** Tuesday, November 01, 2016 2:53 PM
**To:** Ward Stone; Bingham, Ron; Matt Cathey
**Cc:** 'Stan Thomas' (stan@thomasent.com); Lamar Maddox (lmaddox@thomasent.com)
**Subject:** RE: Little Jennie Ranch and Metropolitan Life

As per my telephone call with you my client does not accept this proposal.

Gary A. Barnes, Esq. | Baker Donelson | 404.221.6509 (1509)

---

**From:** Ward Stone [mailto:WStone@stoneandbaxter.com]
**Sent:** Monday, October 31, 2016 4:12 PM
**To:** Barnes, Gary; Bingham, Ron; Matt Cathey; Ward Stone
**Cc:** 'Stan Thomas' (stan@thomasent.com); Lamar Maddox (lmaddox@thomasent.com)
**Subject:** Little Jennie Ranch and Metropolitan Life
**Importance:** High

Dear Gary and Ron,

    Per our telephone conversation of this afternoon, attached are pdf and Word© versions of a proposed contract for the purchase of the Little Jennie Ranch from KJ Overseas Investment Limited, a Chinese private limited liability company for $35,000,000.00, with a closing to occur on or before December 31, 2016. The principal of the purchaser is known to our client, and is an investor in another project of Stan's. The U.S. Agent for the purchaser is NYSA Capital, LLC (Atlanta). I am advised the purchaser will be represented by William J. Ching, at Nelson Mullins, Atlanta, although we have not spoken yet.

    Our client requests an extension to close until December 31. The October 31 payment of $135,000 is being made today and we will maintain interest through the closing. All other terms of the Consent Order and Plan will remain in effect. Under the plan, if Met Life and the Debtor agree upon a modification, we can effect a modification to the Plan through private balloting. Please advise if this is acceptable to your client.

**Sincerely,**

**Ward Stone**
**Stone & Baxter, LLP**
**Suite 800**
**577 Mulberry Street**
**Macon, Georgia 31201**
**(478) 750-9898**
**(478) 750-9899 (fax)**
**wstone@stoneandbaxter.com**

CONFIDENTIALITY: This e-mail may contain confidential information intended only for the person(s) named. Any use, distribution, copying or disclosure by any other person is strictly prohibited by the Electronic Communications Privacy Act, 18 U.S.C. Sec. 2510-2521. If you receive this e-mail in error, or are not the named recipient(s), please be advised that the dissemination, distribution or copying of this message is strictly prohibited. Please notify the sender at either the e-mail address or phone number noted above and delete this e-mail from your computer. Receipt by anyone other than the named recipient(s) is not a waiver of attorney-client, work product, or other applicable privilege.

TREASURY DEPARTMENT CIRCULAR 230 NOTICE: Unless expressly stated otherwise, any information, opinion or advice included in this communication (including any attachments) is not intended to constitute a complete analysis of all tax considerations, and is not intended to be used (and cannot be used) for (i) the purpose of avoiding any tax-related penalty that may be imposed under the Internal Revenue Code, or (ii) to support the promotion or marketing of, or to recommend to another party any transaction or matter related to federal taxation. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

---

Under requirements imposed by the IRS, we inform you that, if any advice concerning one or more U.S. federal tax issues is contained in this communication (including in any attachments and, if this communication is by email, then in any part of the same series of emails), such advice was not intended or written by the sender or by Baker, Donelson, Bearman, Caldwell & Berkowitz, PC to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or tax-related matter addressed herein.

This electronic mail transmission may constitute an attorney-client communication that is privileged at law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this electronic mail transmission in error, please delete it from your system without copying it, and notify the sender by reply e-mail, so that our address record can be corrected.

**Exhibit 7**

**Motion to Modify Plan**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**NEWNAN DIVISION**

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| | : | |
| **FOURTH QUARTER PROPERTIES 86, LLC,** | : | **Case No. 15-10135-whd** |
| | : | |
| Debtor. | : | |
| | : | |

**MOTION TO MODIFY PLAN**

Fourth Quarter Properties 86, LLC, Reorganized Debtor (the "**Debtor**"), hereby moves

the Court, pursuant to 11 U.S.C. § 1127(b), for entry of an Order approving and authorizing the

modification of the Debtor's Amended Plan of Reorganization, respectfully showing as follows:

**I.    Jurisdiction, Venue, and Procedural Background**

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and

157. This Motion concerns estate property and the administration of the estate and is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (D). Venue is proper in this Court pursuant

to 28 U.S.C. §§ 1408 and 1409.

2.    On January 22, 2015, Debtor filed a voluntary petition in this Court for

reorganization under Chapter 11 of the United States Bankruptcy Code.

3.    No Official Committee of Unsecured Creditors has been appointed or organized.

**II.    Factual Background**

4.    Debtor, although headquartered in Newnan, Georgia, operates a working cattle

ranch known as the Little Jennie Ranch situated on over 3,000 acres of real property in Sublette

County, Wyoming (the "**Ranch**").

5.    As of the Petition Date, Debtor valued its assets at $49,124,607.73, primarily

comprised of the above-described real property located in Sublette County, Wyoming valued at

1

$46,029.895.50 and $3,094,712.23 in personal property primarily consisting of cattle and accounts receivable. [Doc. No. 30].

6.  As of the Petition Date, Debtor had total estimated liabilities of $75,377,945.46, consisting of a disputed secured obligation to MetLife of approximately $23,203,543.17, which was subsequently settled by consent order for $26,817,815.96, entered by this Court on December 2, 2015. [Doc. No. 136]. The Ranch also secured collateral for a second secured obligation in favor of John D. Phillips in the amount of $28,051,076.56. [Doc. No. 30]. Debtor also scheduled various unsecured liabilities totaling $19,166,185.61 consisting of $24,133.63 in trade payables and $19,142,051.98 in loans from affiliates. [Doc. No. 30].

7.  Prior to the Petition Date, the Debtor executed and delivered a First Mortgage Note to Metropolitan Life Insurance Company in the principal amount of $30,000,000.00 (the "**Note**"). The Note was secured by virtue of a Security Agreement in the above-described real property as well as Debtor's interest in USDA Forest Service Grazing Permits Nos. 232 and 4105 (the "**Collateral**"). The First Mortgage and Security Agreement are recorded in the Office of the County Clerk of Sublette County, Wyoming in Book 143, Page 54.

8.  Subsequent to execution of the First Mortgage and Security Agreement, Metropolitan Life Insurance Company assigned to MLIC Asset Holdings, LLC an 86.666667% interest in the First Mortgage and Security Agreement and the remaining 13.333333% interest to MLIC CB Holdings, LLC (collectively "**MetLife**").

9.  John D. Phillips ("**Mr. Phillips**") holds a junior mortgage on the Ranch to secure a debt in the amount of $28,051,076.56 as of the Petition Date.

10.  On August 28, 2015, Debtor filed its *Disclosure Statement and Liquidating Plan of Reorganization* (the "**Original Plan**"). [Doc. Nos. 105 and 106].

2

11.     On October 16, 2016, MetLife filed its *Motion for Relief form the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) and (d)(2), Request for Adequate Protection or, in the Alternative Motion to Convert Case to Chapter 7* (the "**Motion for Relief**").  [Doc. No. 117]..

12.     On December 23, 2015, Debtor filed its *Amended Disclosure Statement and Amended Liquidating Plan of Reorganization* (the "**Plan**").  [Doc. Nos. 140 and 141].

13.     On March 15, 2016, the Plan was confirmed by this Court pursuant to 11 U.S.C. § 1129 (the "**Confirmation Order**").  [Doc. No. 168].

14.     In sum, the Plan provided Debtor with a 'drop dead' date of selling the real property on or before October 31, 2016 or MetLife would have relief from the automatic stay to pursue its state law remedies.

15.     During the course of the Plan, the Debtor actively marketed the property.

16.     The marketing efforts generated significant interest in the property.

17.     Due to the seasonal real estate market in Wyoming, the prime period for property sales is the summer.

18.     In the summer of 2016, the area surrounding the ranch was engulfed by forest fire, severely inhibiting site visits to the property.

19.     According to news sources, a lightning-sparked fire was discovered around 2:30 p.m. on Sunday, July 17, 2016 next Highway 191 at Cliff Creek (the "**Fire**").  As of August 1, 2016, the Fire had burned approximately 29,000 acres of land in close proximity to the Debtor's real property.  According to the local newspaper, to contain the fire, the firefighters set up a preventative burn "past the east end of Little Jennie Ranch hayfields between Shoal and Dell creeks."  Furthermore, the Ranch was used as the staging area for firefighters battling the blaze.

20.    In the end, the Fire engulfed more than 34,313 acres and resulted in the closure of Highway 191, the main artery between the ranch and Jackson, Wyoming, and evacuations in the vicinity. The Ranch was ordered evacuated from July through September 2016, during which time the property could not be shown to potential purchasers.

21.    The Fire was eventually contained in August, but nonetheless severally impaired the marketability of the property during the prime summer sales period and resulted in the death of a number of the Debtor's cattle.

22.    With the monumental and unexpected fire, Debtor was able to obtain an offer for the sale of the real and personal property.

23.    On October 31, 2016, Debtor received an offer to purchase the real and personal property for the sum of $35,000,000.00 (the "**Offer**"). The purchaser of the property is KJ Overseas Investment Limited, a Chinese private limited liability company (the "**Purchaser**") who Debtor understands is represented by William J. Ching, Esq. of Nelson Mullins in Atlanta.

24.    The closing of the Offer is scheduled to occur on or before December 31, 2016.

25.    On October 31, 2016, counsel for Debtor conveyed the offer to counsel for MetLife via telephone call and email.

26.    Debtor in a good faith attempt to follow the terms of the Plan and Consent Order, requested a sixty (60) day extension until December 31, 2016 to sell the property and offered to continue to make Adequate Protection Payments during the extension.

27.    MetLife rejected the Debtor's proposal.

28.    Furthermore, MetLife's reason for rejecting the proposal and Offer is that it did not know the Purchaser. On November 9, 2016, MetLife's counsel indicated after rejection MetLife has not performed any due diligence on the Purchaser and would not do so.

4

29.     The sale to the Purchaser would generate proceeds to pay MetLife in full.

30.     The sale to the Purchaser would generate proceeds to pay Mr. Phillips in part.

31.     The sale to the Purchaser would generate proceeds to pay unsecured creditors in part.

**III.    Relief Requested**

32.     Attached hereto as **Exhibit A** and incorporated herein by reference is the Modification to Confirmed Plan of Reorganization (the "**Modification**").

33.     In sum, the Modification simply changes the Debtor's deadline to sell the property from October 31, 2016 to December 31, 2016.

34.     11 U.S.C. § 1127(b) provides:

(b) The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

35.     Thus, for this Court to approve a modification of the Plan post-confirmation, it must find (1) the modification is proposed by the reorganized debtor, (2) substantial consummation of the plan has not occurred, (3) the plan as modified meets the requirements of §§ 1122 and 1123, (4) the circumstances warrant such modification, and (5) notice has been given and a hearing held.

36.     "Substantial consummation" as defined in 11 U.S.C. §1101(2), has not yet occurred.  Specifically, not all or substantially all of the property proposed by the Plan to be transferred has been transferred as the ranch, which was proposed by the Plan to be sold, has not yet been sold.  Furthermore, no distributions under the plan have been made. Substantial

5

consummation requires all three elements.

37.      The Plan, including the Modification, meets the requirements of §§ 1122 and 1123.

38.      Courts have granted modification of plans where the failure was not the fault of the debtor, but was a result of some unexpected third-party's failure or an unanticipated event.

39.      The case having the greatest factual similarity to the case at bar is *In re Temple Zion*, 125 B.R. 910, 913 (Bankr. E.D. Pa. 1991). In *Temple Zion*, the court found circumstances warranted such modification because the sale of an unimproved portion of real property, "the centerpiece of the Plan", was not sold prior to the deadline contained in the plan due to the failure of the zoning board to approve the necessary zoning for debtor to sell to an identified buyer. Furthermore, the debtor would continue to make adequate protection payments and the objecting secured lender held "a substantial equity cushion." The court reviewed the requirements of § 1127(b) and found that the Debtor had satisfied each. Thus, the court approved the requested modification over the vehement objection of the secured creditor.

40.      *In re Boylan Intern., Ltd.*, 452 B.R. 43 (Bankr. S.D.N.Y. 2011) also supports the Reorganized Debtor's request for modification. In *Boylan*, the debtor's plan provided for a liquidation trust with "the Trust's most important asset" being a malpractice claim against Debtor's former counsel. *Id.* at 45. The court found that "the delay in prosecuting the Malpractice Claim was unforeseeable because of protracted trial and appellate litigation" since after two and a half years, the proceeding has only passed the motion to dismiss stage. *Id.* at 49. The court focused on the "opportunity to achieve value from the Trust's most important asset."

41.      *In re Dean Hardwoods, Inc.*, 431 B.R. 387 (Bankr. E.D.N.C. 2010) illustrates the distinction the courts draw in determining whether to permit a modification of a confirmed plan.

6

In *Dean*, the court reviewed a motion by the debtor to modify the plan as to two creditors. The court granted debtor's motion as to one, but not the other, creditor. As the first creditor, the court found that the debtor was unable to obtain approval by the appropriate governmental entity of a new product, TimberSIL, for sale in North Carolina. This, the court found, was appropriate "unforeseen changed circumstances" sufficient to justify the modification as to the first creditor. *Id.* at 393-94. As to the second creditor, it was the lessor of equipment used by the debtor, who was not making adequate protection payments. Thus, the court found that the proposed plan modification was not fair and equitable and denied the proposed modification as to the second creditor. *Id.* at 394.

42.      Both *Temple Zion* and *Boylan* are similar to this case in that they involve property that is the "centerpiece of the Plan", *Temple Zion*, 125 B.R. at 913, but more importantly, both courts found that the debtors were not at fault for the delay and were attempting to provide a better return for unsecured creditors. Debtor respectfully submits that the Court should make these finding in this case as well.

43.      The Fire prevented Debtor from marketing the property to the full extent of its ability. The smoke associated with the Fire would diminish the view and the atmosphere that is such a large part of the value of the Ranch and which is critical to the potential purchasers of the property. Second, because the Fire closed off the road between Bondurant and the ranch, it inhibited traffic to and from the Ranch which would lessen, if not eliminate, the possibility of potential purchasers actually traveling to the Ranch to view the property.

44.      MetLife would not in any way be harmed by the slight delay in obtaining the proceeds of its collateral. Debtor will continue to make adequate protection payments, which will account for the time period—no more than a month—between when MetLife could foreclose

after the required month of advertising and when it would receive its proceeds upon a December 31, 2016 close of the sale between Debtor and the Purchaser.

45.     In contrast, it is likely Mr. Phillip's lien would be eliminated and he would receive no proceeds under the foreclosure.

46.     Likewise, all trade creditors would suffer the same fate and receive no proceeds under the foreclosure.

47.     Debtor submits that its fiduciary duty to creditors require it to bring this motion to prevent one creditor, MetLife, from acting unreasonably and to the direct detriment of the other creditors.

WHEREFORE, the Debtors respectfully requests that the Court enter an Order allowing it to modify its Plan of Reorganization, as more specifically set forth in Modification to Confirmed Plan of Reorganization attached hereto as **Exhibit A**.

Respectfully submitted this ____ day of November, 2016.

> **STONE & BAXTER, LLP**
> By:
>
> /s/ *Ward Stone, Jr.*
> Ward Stone, Jr.
> Georgia Bar No. 684630
> Matthew S. Cathey
> Georgia Bar No. 759547
> Thomas T. McClendon
> Georgia Bar No. 431452
> Counsel for Debtor

Fickling & Co. Building, Suite 800
577 Mulberry Street
Macon, Georgia 31201
(478) 750-9898
(478) 750-9899 *fax*
wstone@stoneandbaxter.com
mcathey@stoneandbaxter.com
tmcclendon@stoneandbaxter.com

g:\clients\fqp 86\post confirmation\motion to modify plan.11.10.16.docx

8

EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| | : | |
| **FOURTH QUARTER PROPERTIES 86, LLC,** | : | **Case No.  15-10135-whd** |
| | : | |
| Debtor. | : | |

## MODIFICATION TO CONFIRMED PLAN OF REORGANIZATION

Fourth Quarter Properties 86, LLC, Chapter 11 Reorganized Debtor in the above-referenced case (the "**Debtor**"), modifies its *Amended Plan of Reorganization dated December 23, 2015*, as confirmed by Order of this Court dated March 15, 2016 (the "**Plan**") pursuant to 11 U.S.C. §1127(b) before substantial consummation as follows:

1.      Paragraph 3.2.3 of the Plan, regarding the treatment of Class 2 claims is deleted in its entirety and in its place substituted with the following:

> **3.2.2   Treatment of Claims in Class 2.**  The Allowed Secured Claims of MLIC Asset Holdings, LLC and MLIC CB Holdings, LLC in the stipulated amount of $26,817,815.96 as of the Petition Date, plus interest at the non-default rate of 5% per annum accrued from the Petition Date to the Closing Date, plus post-petition reasonable attorney's fees and costs subject to review and approval by the Debtor, and less adequate protection payments made prior to the Closing Date, collateralized by a security interest in the Real Property is included in Class 2 and shall be paid in full on the Effective Date from the Net Proceeds from the sale of the Real Property. The Real Property collateralizing any Allowed Secured Claim in Class 2 shall be sold, under this Plan, free and clear of liens, claims, or interests pursuant to 11 U.S.C. § 1123(b)(4), with such liens claims or interest attaching to the proceeds of the sale, and the Debtor and any holder of any Allowed Secured Claim in Class 2 shall comply with 11 U.S.C. § 1142(b) with respect to the transfer of the Real Property free and clear of liens, claims, and interests.  In the event the proposed sale of the Real Property does not close on or before December 31, 2016, MetLife shall have relief from the stay to pursue its state law remedies, with respect to its collateral.  If the Real Property does not sell for an amount in excess of the Allowed Amount of the Allowed Secured Claim in Class

9

2 as provided herein, the Net Proceeds of the Sale will be paid to the holder of the Class 2 Allowed Secured Claim, and the balance of the Allowed Claim in Class 2, including accrued but unpaid interest will be included in Class 5 and paid as provided for Allowed Claims in such Class. No provision of this Plan shall impair the credit bid rights of the holder of the Class 2 Claim or the right of the Debtor to contest the amount of any deficiency claim included in Class 5. Except as provided in Section 4.2.9 of the Plan, and in this Order, the Plan shall not be deemed or construed to impair the rights, powers, or remedies available to the Class 2 claimant, whether under the Class 2 claimant's loan, transaction documents, or Pre-Petition Wyoming Judgment, at law, or in equity, against any non-debtor (including, without limitation, any co-maker of any note, any guarantor, or any other co-obligor of the Debtor) with respect to the indebtedness giving rise to the Allowed Class 2 Claim.

2.       Paragraph 4.2.4 of the Plan, regarding the Overview of Duties of the Debtor is

deleted in its entirety and in its place substituted with the following:

4.2.4   **Overview of Duties of the Debtor.**  The Debtor shall be empowered to and shall liquidate all real and personal property of the Estate and may engage brokers, auctioneers, and other professionals as may, in the judgment of the Debtor, be necessary for liquidating the Assets in an efficient and cost-effective manner.  The Debtor shall market the Real Property through a licensed broker and will attempt to achieve a sale between the Confirmation Date and December 31, 2016 (the "Marketing Period").  The Debtor may market the Personal Property in tandem with the Real Property or separately.  The Debtor shall provide all marketing updates received by the Reorganized Debtor to the holders of Allowed Secured Claims during the Marketing Period, and shall advise all holders of Allowed Secured Claims of any and all written offers for the real or personal property, within three (3) days of receipt by the Debtor during the Marketing Period.  The Debtor shall not accept or reject any offer until at least seven (7) days after forwarding said offer to counsel for the holders of Allowed Secured Claims, unless the Class 2 holder of Allowed Secured Claim notifies Debtor that it has no opposition to Debtor's acceptance of the offer. The Debtor shall notify the holders of Allowed Secured Claims within twenty-four (24) hours of acceptance of any offer for the real property and provide sufficient information and details to enable the holders of Allowed Secured Claims to exercise their credit bid rights, if appropriate, as preserved under the Plan.  All information provided by the Debtor to Parties in Interest pursuant to this Paragraph shall be kept confidential by the recipients thereof, and any filing with the Court during the Marketing Period arising out of or related to such information shall be filed under seal.  If the Real Property and Personal Property are purchased by a common purchaser, the Debtor shall allocate the purchase price between the Real Property and Personal Property for purposes of the closing of the sale, any tax reporting in connection with the sale, and for purposes of determining distributions under this Plan.  If the Personal

10

Property does not sell in tandem with the Real Property or otherwise by December 31, 2016, the Debtor may arrange for the sale, for cash, of such Personal Property by private sale or public auction, employing such professionals as necessary to consummate such sale, and shall distribute the proceeds of such sale as provided under this Plan.  The Debtor shall make all distributions required to be made under this Plan, and the Debtor shall be authorized and empowered to fully act as of the Confirmation Date, including without limitation, to (a) prosecute, settle or release all Causes of Action which the Debtor deems pursuit of to be prudent and cost effective, in accordance with the best interest of and for the benefit of the Creditors entitled to receive distributions under the Plan; (b) liquidate the Assets, including through any pending sale motions initiated by the Debtor, but not consummated as of the Confirmation Date or otherwise; (c) prosecute objections to Claims; (d) supervise the marketing and sale of the Property; (e) resolve Disputed Claims; (f) make distributions to the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, and holders of other Allowed Claims (as their respective interests may appear in accordance with this Plan) in as prompt, efficient and orderly fashion as possible in accordance with the Plan; (g) perform administrative services related to the implementation of this Plan; (h) employ attorneys and other Professionals, as further set forth below, to assist in fulfilling the Debtor's obligations under the Plan; and (i) otherwise act in accordance with this Plan and orders of the Bankruptcy Court.

3.      Paragraph 1.92 of the Plan in Schedule 1, regarding the definition of "Surrender Date" is deleted in its entirety and in its place substituted with the following:

**1.92**      **"Surrender"** means the transfer of Real Property to the holders of Allowed Secured Claims in Class 2 in the event the proposed sale of the Real Property does not close on or before December 31, 2016.

11

Dated:  November ___, 2016.

**STONE & BAXTER, LLP**
By:

/s/ Ward Stone, Jr.
Ward Stone, Jr.
Georgia Bar No. 684630
Matthew S. Cathey
Georgia Bar No. 759547
Thomas T. McClendon
Georgia Bar No. 431452
Counsel for Debtor

Fickling & Co. Building, Suite 800
577 Mulberry Street
Macon, Georgia 31201
(478) 750-9898
(478) 750-9899 *fax*
wstone@stoneandbaxter.com
mcathey@stoneandbaxter.com
tmcclendon@stoneandbaxter.com